USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit __________________________ Nos. 96-1015 96-1068 ROLAND C. DUBOIS and RESTORE: THE NORTH WOODS, Plaintiffs, Appellants, v. DEPARTMENT OF AGRICULTURE, UNITED STATES, ET AL., and LOON MOUNTAIN RECREATION CORPORATION, Defendants, Appellees. ____________________ ERRATA SHEET The opinion of this Court is amended as follows: Cover sheet: Replace case number "96-1086" with "96-1068". United States Court Of Appeals United States Court Of Appeals For the First Circuit For the First Circuit ______________________ Nos. 96-1015 96-1068 ROLAND C. DUBOIS and RESTORE: THE NORTH WOODS, Plaintiffs, Appellants, v. UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., and LOON MOUNTAIN RECREATION CORPORATION, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Paul J. Barbadoro, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin and Bownes, Senior Circuit Judges. _____________________ ____________________ Roland C. Dubois pro se. ___ __ Cindy Ellen Hill for appellant RESTORE: The North Woods. ________________ Jeffrey P. Kehne, Attorney, with whom Lois J. Schiffer, Assistant _________________ ________________ Attorney General, Sylvia Quast, John A. Bryson, Attorneys, Environment ____________ ______________ & Natural Resources Division, U.S. Department of Justice, Washington, DC, Paul M. Gagnon, United States Attorney, T. David Plourde, ________________ __________________ Assistant United States Attorney, Concord, NH, Wendy M. John, Stuart ______________ ______ L. Shelton, Office of the General Counsel, U.S. Department of ___________ Agriculture, Washington, DC, and Leslie M. Auriemmo, Office of the ___________________ General Counsel, U.S. Department of Agriculture, Milwaukee, WI, were on brief for appellees U.S. Department of Agriculture; Daniel Glickman, Secretary, U.S. Department of Agriculture; Jack Ward Thomas, Chief, U.S. Forest Service; Robert Jacobs, Regional Forester, Eastern Region, U.S. Forest Service; Donna Hepp, Forest Supervisor, White  Mountain National Forest. James L. Kruse with whom Gallagher, Callahan & Gartrell, P.A., _______________ ______________________________________ were on brief for appellee Loon Mountain Recreation Corporation. ____________________ December 19, 1996 ____________________ - 3 - BOWNES, Senior Circuit Judge. The defendant- BOWNES, Senior Circuit Judge. ______________________ intervenor Loon Mountain Recreation Corporation ("Loon Corp.") operates a ski resort in the White Mountain National Forest in Lincoln, New Hampshire. In order to expand its skiing facilities, Loon Corp. sought and received a permit to do so from the United States Forest Service.1 Appellant Roland Dubois sued the Forest Service alleging violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C.  4321, et seq., the Clean Water Act ("CWA"), 33 U.S.C. 1251, _______ et seq., the Administrative Procedure Act, 5 U.S.C. 501, et _______ __ seq. ("APA"), and Executive Order 11,990, 42 Fed. Reg. 26,961 ____ (1977), reprinted as amended in 42 U.S.C.A. 4321 (West ________________________ 1994). Appellant RESTORE: The North Woods ("RESTORE") intervened as a plaintiff claiming violations of the same statutes, and appellee Loon Corp. intervened as a defendant. Dubois and RESTORE (collectively referred to as "plaintiffs") and the Forest Service filed cross-motions for summary judgment, and Loon moved to dismiss. The district court granted the Forest Service's motion for summary judgment and denied the other motions. We affirm in part, reverse in part, and remand.  ____________________ 1. The Forest Service, its parent organization, the United States Department of Agriculture, and their agents will be collectively referred to as "the Forest Service" throughout this opinion. -4- I. STATEMENT OF THE CASE I. STATEMENT OF THE CASE _____________________ A. Facts A. Facts _____ The White Mountain National Forest ("WMNF") is a public resource managed by the United States Forest Service for a wide range of competing public uses and purposes, including "outdoor recreation, range, timber, watershed, . . . wildlife and fish purposes," 16 U.S.C. 528 (1994), and skiing, 16 U.S.C. 497(b) (1994). Pursuant to the National Forest Management Act of 1976, the Forest Service makes long- term plans to coordinate these competing uses, 16 U.S.C. 1604(e)(1) (1994), and issues "special use" permits authorizing private recreational services on national forest land, 36 C.F.R. 251.50-.65 (1995). The Forest Service's exercise of its permitting authority is legally constrained by environmental considerations emanating, inter alia, from ___________ NEPA, the CWA, and Executive Order 11,990. Loon Pond is located in the WMNF at an elevation of 2,400 feet. It has a surface area of 19 acres, with shallow areas around the perimeter and a central bowl 65 feet deep. It is unusual for its relatively pristine nature. There is virtually no human activity within the land it drains except skiing at the privately owned Loon Mountain Ski Area. New Hampshire Department of Environmental Services ("NHDES") regulations classify Loon Pond as a Class A waterbody, protected by demanding water quality standards under a -5- variety of criteria, see N.H. Code Admin. R. Env-Ws 432.03, ___ and as an Outstanding Resource Water ("ORW"), protected against any measurable long-term degradation by the State's anti-degradation rules, see id. 437.06; 40 C.F.R.  ___ ___ 131.12(a)(3) (1995). It ranks in the upper 95th percentile of all lakes and ponds in northern New England for low levels of phosphorus, which results in limited plant growth and therefore high water clarity and higher total biological production. The pond supports a rich variety of life in its ecosystem. Loon Pond also constitutes a major source of drinking water for the town of Lincoln 1,600 feet below it. A dam across the outlet of the Pond regulates the flow of water from the Pond to Lincoln's municipal reservoir. Loon Corp., defendant-intervenor herein, owns the Loon Mountain Ski Area, which has operated since the 1960s not far from Loon Pond. Prior to the permit revision that gave rise to this litigation, Loon Corp. held a special use permit to operate on 785 acres of WMNF land. That permit allowed Loon Corp. to draw water ("drawdown") for snowmaking from Loon Pond, as well as from the East Branch of the Pemigewasset River ("East Branch") and from nearby Boyle Brook. In order to use water from Loon Pond, Loon Corp. also needed authorization from the Town of Lincoln and the State of New Hampshire. Beginning in 1974, Loon Corp. was authorized to pump snowmaking water from Loon Pond down to 18 -6- inches below full level.2 A 1988 amendment to this agreement permitted drawdown below the 18-inch level on a case-by-case basis. Combined uses by Lincoln and Loon Corp. during the period governed by these agreements typically caused four- to six-foot fluctuations in the level of Loon Pond. In addition to being used as a source of water for snowmaking, Loon Pond has been the repository for disposal of water after it is pumped through the snowmaking system.3 This includes water that originally came from Loon Pond, as well as water that originated in the East Branch or in Boyle Brook. Approximately 250,000 gallons of East Branch water have been transferred into Loon Pond each year in this manner. Obviously the water discharged into Loon Pond contains at least the same pollutants that were present in the intake water. Evidence in the record indicates that intake water taken from the East Branch contains bacteria, other aquatic organisms such as Giardia lambia, phosphorus, turbidity and heat. Evidence was also introduced in court, but not available prior to the issuance of the Environmental  ____________________ 2. The level of Loon Pond drops when Pond water is used for snowmaking, because the Pond does not receive much natural water through precipitation during the winter. 3. In order for Loon Corp. to make snow, it must pump significantly more water through the system than is actually made into snow. Passing this extra water through the pipes keeps them from freezing. It also provides the pressure that forces the artificial snow out through snowmaking jets. -7- Impact Statement ("EIS"), that oil and grease were present in the discharge water, although their source was disputed.  In 1986, Loon Corp. applied to the Forest Service for an amendment to its special use permit to allow expansion of its facilities within the WMNF. Pursuant to NEPA, 42 U.S.C. 4332, the Service developed a draft EIS, and a supplement to the draft. Responding to criticism of the adequacy of those documents, the Forest Service issued a revised draft EIS ("RDEIS"), which was published for public comment. The RDEIS set forth five alternatives to meet the perceived demand for additional alpine skiing. All five were located at the Loon Mountain site.4  Many individuals and groups, including both plaintiffs, filed comments pointing out various environmental problems with each alternative that involved expanding the ski area. One lengthy comment from the U.S. Environmental Protection Agency ("EPA") expressed its concern that the use of Loon Pond for snowmaking purposes would "use Loon Pond like a cistern" instead of treating it "with care" because it is "acknowledged to be one of the rare high altitude ponds of its size in the White Mountains." Joint Appendix ("JA"),  ____________________ 4. The Forest Service's ten-year plan for the WMNF, issued in 1986, included plans for accommodating increased demand for downhill skiing. It determined that it would meet this demand through expansion of existing ski areas rather than through the creation of new ones. It did not discuss the possibility of meeting the demand through alternative sites outside the national forest. -8- vol. II, Response to Public Comment on RDEIS at A-78. Other commenters suggested that Loon Corp. be required to build artificial water storage ponds, in order to eliminate the problem of depleting Loon Pond when withdrawing water for snowmaking as well as the problem of adding pollutants to Loon Pond when discharging water into the Pond after use. During the EIS process, Ron Buso, a hydrologist for the WMNF, expressed concern to another Forest Service hydrologist that the proposed drawdown of Loon Pond by twenty feet was likely to have a severe impact on the Pond. He explained that natural snowmelt in New Hampshire is extremely acidic and that, as a result of the planned drawdown, a substantial amount of acidic snowmelt would remain in Loon Pond, increasing the Pond's acidity by a factor of two to three times what it would be without the planned drawdown. Without the drawdown, Loon Pond would be relatively full in the spring, and much of the snowmelt from surrounding higher elevations would glide over the surface of the Pond and down the mountain without significantly mixing with other Loon Pond water. According to Buso and a number of scientists whose affidavits were submitted to the district court, the increase in the Pond's acidity due to the planned drawdown would change the chemistry of the Pond, cause toxic metals to -9- be released from the sediment, and kill naturally occurring organisms. Without addressing the issues raised in the Buso memorandum or in the comments suggesting artificial storage ponds, the Forest Service prepared a Final EIS ("FEIS"). The FEIS added a sixth alternative, also on the Loon Mountain site. The new alternative provided for expansion of Loon Corp.'s permit area by 581 acres and for the construction of one new lift and approximately 70 acres of new ski trails, changes designed to accommodate 3,200 additional skiers per day (from the current 5,800 per day). The Forest Service deemed Alternative 6 as the preferred alternative. Under it, Loon Corp. would more than double the amount of water used for snowmaking, from 67 million gallons per year to 138 million gallons. Seventeen million gallons of the increase would be drawn from the East Branch, and 54 million gallons from Loon Pond. In addition, Loon Corp. was authorized to draw the Pond down for snowmaking by fifteen feet, compared to the current eighteen inches. The Forest Service assumed that the Town of Lincoln would need up to an additional five feet of Pond water, making a total of twenty feet that the Pond was expected to be drawn down each year. This would constitute approximately 63% of the Pond's water. In March 1993, the Forest Service published a Record of Decision (ROD) adopting Alternative 6. -10- As a mitigation measure to blunt the adverse environmental impact on Loon Pond, the Forest Service required Loon Corp. to pump water from the East Branch to Loon Pond in December and May of each year if the Pond was not otherwise full at those times. In its FEIS, the Forest Service recognized that the East Branch is a relatively unprotected Class B waterway under New Hampshire law, and that transfer of East Branch water to Loon Pond, a protected Class A waterbody and Outstanding Resource Water under state and federal law, would introduce pollutants into the Pond. Accordingly, it specified that this transfer of East Branch water could not occur if it exceeded certain levels of turbidity, bacteria, or oil and grease. Neither the FEIS nor the ROD set any limits, however, on the level of non- bacterial organisms such as Giardia lambia or on pollutants such as phosphorus that may be present in the transferred water. Nor did the FEIS indicate an alternative means of refilling Loon Pond -- with clean water -- if conditions were such that the transfer of East Branch water would exceed the specified levels.5 It did, however, provide a series of restrictions and monitoring requirements for water levels and  ____________________ 5. As noted supra, absent some other method of refilling, _____ the Pond would be refilled by the melting of acidic snow. -11- water quality, including daily testing of the transferred water for turbidity, bacteria, and oil and grease.6 Dubois and RESTORE appealed the ROD to the Regional Forester and, thereafter, to the Chief of the Forest Service. These appeals were denied. On March 16, 1994, the Forest Service issued a special use permit to Loon Corp., implementing the decision described in the ROD. B. Proceedings Below B. Proceedings Below _________________ Plaintiff Dubois filed a complaint in the United States District Court for the District of Columbia,7 challenging the Forest Service's approval of the Loon Mountain expansion project. He made three arguments.8 First, he argued that the Forest Service actions violated the CWA because they would lead to violations of state water quality standards which, he asserted, have the effect of federal law because they were approved by the federal EPA. Second, he argued that the Forest Service violated both NEPA  ____________________ 6. In response to an earlier draft EIS, the EPA had expressed the following concern: "While monitoring plans have merit, they should not be considered a substitute for a thorough evaluation of a project and its potential impacts prior to action approval." JA, vol. I, at 97; see also _________ Massachusetts v. Watt, 716 F.2d 946, 951-52 (1st Cir. 1983) ______________________ (NEPA "requires an EIS according to its terms," before the agency becomes "committed to [a] previously chosen course of action"). 7. The case was later transferred to the United States District Court for the District of New Hampshire. 8. Plaintiffs made other arguments below, but have not pursued them on appeal. -12- and Executive Order 11,990 by failing to consider alternatives to the use of Loon Pond and failing to develop adequate mitigation measures. Finally, he argued that the Forest Service violated the CWA, 33 U.S.C. 1311, by failing to obtain a National Pollutant Discharge Elimination System ("NPDES") permit before approving Loon Corp.'s expansion plans, which entailed removing water from the East Branch, using it to pressurize and prevent freezing in its snowmaking equipment, and then discharging the used water into Loon Pond. According to Dubois, an NPDES permit was required in order for Loon Corp. to discharge pollutants into Loon Pond, including the discharge from Loon Corp.'s snowmaking equipment. Plaintiff RESTORE, a membership organization, intervened on behalf of its members to challenge the project. RESTORE first reiterated Dubois' claim that an NPDES permit was required. In addition, RESTORE claimed that the Forest Service violated NEPA by failing to prepare a Supplemental EIS after it developed Alternative 6 as the preferred alternative. According to RESTORE, this new alternative, not specifically mentioned in the previously published draft EIS or RDEIS, contained substantial changes to the proposed action that are relevant to environmental concerns, which required a supplemental EIS under NEPA and relevant implementing regulations. Finally, RESTORE claimed that a supplemental EIS was required because the Forest Service's -13- Final EIS failed to "rigorously explore and objectively evaluate all reasonable alternatives" that are capable of meeting the stated goals of the project, as required by 40 C.F.R. 1502.14 (1995). According to RESTORE, the asserted goal of meeting skier demand could have been met by expanding ski areas other than Loon, in particular, ski areas located outside the White Mountain National Forest. The parties cross-moved for summary judgment. Loon Corp. intervened, and moved to dismiss on the ground that both plaintiffs lacked standing. The district court denied Loon Corp.'s motion to dismiss, granted summary judgment for the Forest Service, and denied the plaintiffs' cross-motions for summary judgment. II. DUBOIS' STANDING9 II. DUBOIS' STANDING ________________ The ingredients of standing are imprecise and not easily susceptible to concrete definitions or mechanical applications. Allen v. Wright, 468 U.S. 737, 751 (1984). In _______________ order to have standing to sue, a plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." Baker v. Carr, ______________ 369 U.S. 186, 204 (1962).   ____________________ 9. Defendants have abandoned their challenge to RESTORE's standing. -14- Standing consists of both a constitutional aspect and a prudential aspect. The constitutional dimension derives from the requirement that federal courts can act only upon a justiciable case or controversy. U.S. Const. art. III. If a party lacks Article III standing to bring a matter before the court, the court lacks subject matter jurisdiction to decide the merits of the underlying case. FW/PBS, Inc. v. _______________ City of Dallas, 493 U.S. 215, 231 (1990). ______________ To satisfy the constitutional component of standing, a plaintiff must have suffered an "injury in fact," i.e., an invasion of a legally protected interest. Lujan v. ____ ________ Defenders of Wildlife, 504 U.S. 555, 560 (1992). That injury _____________________ must be "concrete and particularized"; the latter term means the injury must be personal to the plaintiff. Id. at 560 & ___ n.1. It may be shared by many others, United States v. _________________ Students Challenging Regulatory Agency Procedures (SCRAP), ____________________________________________________________ 412 U.S. 669, 687-88 (1973), but may not be common to everyone, see Warth v. Seldin, 422 U.S. 490, 499 (1975). The ___ _______________ injury must also be "actual or imminent, not conjectural or hypothetical," Defenders of Wildlife, 504 U.S. at 560 _______________________ (quotation omitted), and it must be "distinct and palpable," Warth, 422 U.S. at 501. The latter requirement may be _____ satisfied by environmental or aesthetic injuries. See SCRAP, ___ _____ 412 U.S. at 686; Sierra Club v. Morton, 405 U.S. 727, 734 ______________________ (1972). The injury need not be "significant"; a "small" -15- stake in the outcome will suffice, if it is "direct." SCRAP, _____ 412 U.S. at 689 n.14. In addition, the injury must be fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.10 Defenders _________ of Wildlife, 504 U.S. at 560-61. ___________ The doctrine of standing also includes prudential concerns relating to the proper exercise of federal jurisdiction. Among these concerns is the requirement that "a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen, 468 U.S. at 751. In _____ addition, as a general rule, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499. A membership organization _____ constitutes an exception to this general rule: it may assert the claims of its members, provided that one or more of its members would satisfy the individual requirements for  ____________________ 10. Violations of procedural rights, such as those created by NEPA and CWA, receive "special" treatment when it comes to standing. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Defenders of Wildlife, 504 U.S. at 572 n.7. _____________________ As an example, the Supreme Court points to "the procedural requirement for an environmental impact statement before a federal facility is constructed next door" to the plaintiffs. Id. at 572. The contrasting example -- where the disregard ___ of procedural requirements would be held not to impair the ___ plaintiffs' concrete interests -- is "persons who live (and propose to live) at the other end of the country" from the project. Id. at 572 n.7. ___ -16- standing in his or her own right.11 See UAW v. Brock, 477 ___ _____________ U.S. 274, 281-82 (1986). The burden falls on the plaintiff "clearly to allege facts demonstrating that he is a proper party to invoke" federal jurisdiction. Warth, 422 U.S. at 518. The _____ plaintiff must "set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing." United States _____________ v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). "[E]ach _____________ element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with ____ the manner and degree of evidence required at the successive stages of the litigation." Defenders of Wildlife, 504 U.S. ______________________ at 561. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Id. (quoting Lujan v. National ___ __________________ Wildlife Federation, 497 U.S. 871, 889 (1990)). ___________________ The district court denied Loon Corp.'s motion to dismiss Dubois' claims on standing grounds, relying on our  ____________________ 11. An association must meet two other requirements in order to have standing to sue: the interests that the suit seeks to vindicate must be germane to the objectives for which the organization was formed; and neither the claim asserted nor the relief requested requires the personal participation of affected individuals. UAW v. Brock, 477 U.S. 274, 282 ______________ (1986). -17- precedent in Washington Legal Found. v. Massachusetts Bar ______________________________________________ Found., 993 F.2d 962, 971-72 (1st Cir. 1993). In that case, ______ we held that the court need not determine the standing of all plaintiffs if at least one plaintiff has standing to maintain each claim. The district court found that RESTORE had standing to bring all the claims at issue in this case, and, therefore, that the court could reach the merits of all claims without first addressing Dubois' standing. We agree that RESTORE would have standing to raise, on behalf of its members, all the issues in dispute in this litigation. But the district court erred in concluding that it could therefore reach the merits of all claims, because the district court's premise was incorrect: RESTORE did not, even at the district court level, raise the issues relating to Executive Order 11,990 and the state water quality standards, which only Dubois is pursuing here. The situation is not, therefore, analogous to Washington Legal Foundation; ____________________________ if Dubois has no standing, we cannot decide issues that RESTORE has never raised. We find, however, that Dubois does satisfy all requirements for standing to litigate the claims he seeks to -18- pursue on appeal. His second amended complaint12 alleged that [his] principal residence from 1959-1977 was in Lincoln, New Hampshire. [He] has returned to the Lincoln area at least once per year -- and occasionally up to twelve or more times per year -- since 1977. During these trips, [he] has visited relatives and friends, collected botanical samples for scientific analysis, and engaged in recreational activities in and around the WMNF and the Loon Mountain Ski Area. Plaintiff's interest in the environmental, recreational and aesthetic quality of the WMNF are and will be adversely affected by the Defendants' actions challenged in this Complaint.  Second Amended Complaint, 5. The last sentence is rather conclusory, but the entire complaint, taken together with inferences reasonably drawn from its allegations, contains sufficient "reasonably definite factual allegations," AVX, ___ 962 F.2d at 115, to survive a motion to dismiss.  "We are mindful that, under the notice pleading requirements of the federal rules, the allegations of the  ____________________ 12. Dubois moved for leave to file a third amended complaint and a reply brief. The district court failed to rule on this motion until after the court's jurisdiction was terminated by the docketing of RESTORE's appeal. Dubois asked this court to clarify the status of this motion in light of the district court's order granting Dubois' post-judgment motion under Fed. R. Civ. P. 60(a) for clarification; the court indicated that it had intended to allow the third amended complaint and the reply brief, but did not, due to clerical mistakes. Docket Entry 79-b. We need not decide Dubois' motion because of our decision on the merits. Resolving the motion would not, in any event, affect our decision on the standing issue, because the third amended complaint contains language identical to the second regarding standing. -19- complaint should be construed favorably to the complainant on a motion to dismiss." Papex Int'l Brokers v. Chase Manhattan ______________________________________ Bank, 821 F.2d 883, 886 (1st Cir. 1987). Moreover, as noted ____ supra, at the pleading stage, "we presum[e] that general _____ allegations embrace those specific facts that are necessary to support the claim." Defenders of Wildlife, 504 U.S. at _____________________ 561 (quotation omitted). Further, the record reveals that the district court had adduced additional information during its consideration of the standing issue. See AVX, 962 F.2d ___ ___ at 114 n.6 (appellate court considering standing issue went beyond the complaint "in a record-wide search for facts supporting" the claim of standing). Dubois' local counsel represented to the court that Dubois continues to return "regularly," at least annually, to his parents' home in Lincoln; that he drinks the water from the "Town of Lincoln water supply that comes down from Loon Pond"; that he "walks those mountains" in the WMNF. Transcript of Hearing, June 14, 1995, at 7-9. The court expressed its understanding of Dubois' standing allegations as follows: Mr. Dubois' injury in fact is he periodically comes back to the area and enjoys its natural beauty and will be injured by not being able to experience its natural beauty if the project is allowed to go forward? . . . It's not a case of someone who's simply saying I'm an environmentalist and I want to protect the environment, which everybody presumably has an interest in doing. It's somebody who says I'm back there a lot, I drink the water a lot, I'm up -20- there in the woods a lot, and this is going to hurt me. Id. at 8, 12. ___ We think it useful to compare the facts here with those alleged in AVX, 962 F.2d at 116-17. In AVX, the ___ ___ plaintiff organization had simply made conclusory allegations that its "members have been and will continue to be harmed by the releases that [were] the subject of [that] litigation"; its "averment [had] no substance: the members [were] unidentified; their places of abode [were] not stated; the extent and frequency of any individual use of the affected resources [was] left open to surmise." Id. This court in ___ AVX pointed to the allegations in SCRAP, 412 U.S. 669, as ___ _____ attenuated as they were, in which "there was a geographic nexus; all the association's members resided in a single, defined metropolitan area, directly affected by the challenged action. . . . In SCRAP, unlike [AVX], the claimed _____ ___ environmental injury was tied to the particular pursuits of particular persons." AVX, 962 F.2d at 117. ___ The instant case, in contrast with AVX, presents a ___ particular person, whose family home is located squarely within the geographical area allegedly directly affected by the proposed project, who visits the area regularly, who drinks the water which will allegedly be tainted by pollutants, and who will allegedly be deprived of his environmental, aesthetic and scientific interests in ways -21- directly tied to the project he challenges. These are the types of interests which the Supreme Court has held -- when asserted by an organization such as RESTORE on behalf of its members -- satisfy the constitutional requirements for standing. See SCRAP, 412 U.S. at 685-87; Sierra Club v. ___ _____ _______________ Morton, 405 U.S. at 734-35 & n.8; see also supra, note 10. ______ ________ _____ There is certainly no reason why an organization would have standing to raise these interests on behalf of its members, but an individual such as Dubois would not have standing to raise the same interests on his own behalf. Thus, with the degree of specificity necessary at the pleading stage, Dubois has articulated -- directly and by inference -- how his personal interests will be adversely affected by the Loon expansion proposal.13 Finally, his injuries are "likely to be redressed" by the relief he has requested in the complaint: inter alia, an injunction ___________ against the project's proceeding. See Defenders of Wildlife, ___ _____________________ 504 U.S. at 560-61.  ____________________ 13. Our analysis is not altered by the fact that three of the parties filed cross-motions for summary judgment. The standing issue was raised only in Loon Corp.'s motion to dismiss. Where, as here, the defendants have not contradicted the factual allegations concerning standing that we deem adequate at the motion to dismiss stage, we will not subject those allegations to a summary judgment level of scrutiny in the absence of a motion for summary judgment on the issue. In these circumstances, "[t]he standing analysis is no different, as a result of the case having proceeded to summary judgment, than it would have been at the pleading stage." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. ________________________________________ 26, 37 n.15 (1976). -22- As for the prudential standing requirements, there is no dispute that the violations and injuries alleged in the complaint are the sort that NEPA, the CWA, and the Executive Order were "specifically designed" to protect. See Lujan v. ___ _________ National Wildlife Federation, 497 U.S. at 886. Moreover, our ____________________________ discussion above related only to Dubois' own legal rights and interests, not those of third parties. Accordingly, we find that Dubois has standing to litigate the claims he seeks to pursue on appeal. III. STANDARD OF REVIEW III. STANDARD OF REVIEW __________________ The district court's order granting summary judgment is subject to de novo review. Borschow Hosp. and ________ __________________ Medical Supplies v. Cesar Castillo, Inc., 96 F.3d 10, 14 (1st ________________________________________ Cir. 1996); Lawrence v. Northrop Corp., 980 F.2d 66, 68 (1st __________________________ Cir. 1992). We independently weigh the merits of the summary judgment motions "without deference to the reasoning of the district court." Hughes v. Boston Mut. Life Ins. Co., 26 _____________________________________ F.3d 264, 268 (1st Cir. 1994). Accordingly, we must reverse the court's grant of summary judgment unless "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In analyzing the issues, we will review the record in the light most favorable to the non-movants, and make all inferences in their favor. Borschow, 96 F.3d at 14; ________ -23- Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st ______________________________________ Cir. 1990). It is well established that a reviewing court may not set aside administrative decisions "simply because the court is unhappy with the result reached." Baltimore Gas & ________________ Elec. Co. v. Natural Resources Defense Council, Inc. _____________________________________________________________ ("NRDC"), 462 U.S. 87, 97 (1983) (quoting Vermont Yankee ________ _______________ Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978)). The ____________________________ fundamental policy questions are "appropriately resolved in Congress and in the state legislatures"; they "are not ___ subject to reexamination in the federal courts under the guise of judicial review of agency action."14 Vermont _______ Yankee, 435 U.S. at 558. Courts may set aside agency ______ decisions "only for substantial procedural or substantive reasons as mandated by statute." Id. ___ The applicable statutes here are NEPA and the CWA. NEPA requires that the agency take a "hard look" at the environmental consequences of a project before taking a major action. Baltimore Gas, 462 U.S. at 97 (quoting Kleppe v. ______________ __________ Sierra Club, 427 U.S. 390, 410 n.21 (1976)). It is the role ___________ of the courts on judicial review to ensure "that this legal  ____________________ 14. For example, in Vermont Yankee, Congress had made the _______________ policy decision that the nation would try nuclear power; the Court refused to second-guess that decision in reviewing an EIS pursuant to NEPA. 435 U.S. at 557-58. -24- duty is fulfilled." Foundation on Economic Trends v. ____________________________________ Heckler, 756 F.2d 143, 151 (D.C. Cir. 1985).  _______ Congress, in enacting NEPA, meant "to insure a fully informed and well-considered decision." Vermont _______ Yankee, 435 U.S. at 558. But NEPA "does not mandate ______ particular results"; it "simply prescribes the necessary process." Robertson v. Methow Valley Citizens Council, 490 ____________________________________________ U.S. 332, 350 (1989). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Id.; see also Baltimore Gas, 462 U.S. at 97. Thus, "[t]he ___ _________ _____________ role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or ___ capricious." Baltimore Gas, 462 U.S. at 97-98 (emphasis ______________ added).  Like NEPA, the CWA does not articulate its own standard of review; therefore the appropriate scope of review for both NEPA claims and CWA claims is the standard set forth in the APA. 5 U.S.C. 706(2)(A) (1994); see Town of Norfolk ___ _______________ v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1445 (1st _________________________________ Cir. 1992); Oregon Natural Resources Council v. U.S. Forest ________________________________________________ Service, 834 F.2d 842, 851-52 (9th Cir. 1987). _______ -25- Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). Errors of law are reviewed by the court de novo. 5 U.S.C. 706 (1994) ("the reviewing court shall _______ decide all relevant questions of law"); Howard v. FAA, 17 _____________ F.3d 1213, 1215 (9th Cir. 1994). On the other hand, the task of a court reviewing agency action under the APA's "arbitrary and capricious" standard, 5 U.S.C. 706(2), is "to determine whether the [agency] has considered the relevant factors and articulated _______________________________ ___________ a rational connection between the facts found and the choice _____________________ made." Baltimore Gas, 462 U.S. at 105 (emphasis added) ______________ (citations omitted); see also Motor Vehicle Mfrs. Ass'n v. ________ _____________________________ State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); _________________________________ Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 ________________________________________________________ U.S. 281, 285-86 (1974); Citizens to Preserve Overton Park, ___________________________________ Inc. v. Volpe, 401 U.S. 402, 415-17 (1971). If the agency _____________ decision was based on a consideration of the relevant factors and there has not been "a clear error of judgment," then the ___ agency decision was not arbitrary or capricious. Overton _______ Park, 401 U.S. at 416; Marsh v. Oregon Natural Resources ____ ___________________________________ Council, 490 U.S. 360, 378 (1989).  _______ -26- In State Farm, the Supreme Court offered several __________ examples of circumstances in which an agency action "normally" would be considered arbitrary and capricious: situations where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43. These are __________ merely "examples," Puerto Rico Sun Oil Co. v. U.S. EPA, 8 ______________________________________ F.3d 73, 77 (1st Cir. 1993); others could be recited as well. Whether reviewing an EIS or a rulemaking proceeding, the "reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given." State _____ Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. ____ ____________________ 194, 196 (1947)). "While this is a highly deferential standard of review, it is not a rubber stamp." Citizens Awareness ___________________ Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, _______________________________________________ 290 (1st Cir. 1995). Although "the ultimate standard of review is a narrow one," the court must undertake a "thorough, probing, in-depth review" and a "searching and -27- careful" inquiry into the record.15 Overton Park, 401 U.S. ____________ at 415-16. In order for an agency decision to pass muster under the APA's "arbitrary and capricious" test, the reviewing court must determine that the decision "makes sense." Puerto Rico Sun Oil, 8 F.3d at 77. Only by _____________________ "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision" can the court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." Marsh, 490 U.S. at 378 _____ (internal quotation omitted). IV. THE NEPA/EIS ISSUE IV. THE NEPA/EIS ISSUE __________________ The National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq., declares a broad national commitment __ ____ to protecting and promoting environmental quality. Robertson, 490 U.S. at 348; 42 U.S.C. 4331 (1994). The _________ primary mechanism for implementing NEPA is the Environmental Impact Statement (EIS). 42 U.S.C. 4332 (1994). The EIS is an "action-forcing" procedure, designed "[t]o ensure that this commitment is infused into the ongoing programs and actions of the Federal Government." Robertson, 490 U.S. at _________ 348 (quotation omitted).  ____________________ 15. We note that the two-step process articulated in Chevron _______ U.S.A. v. NRDC, 467 U.S. 837, 842-43 (1984), does not apply ______________ here, because we are not reviewing an agency's interpretation of the statute that it was directed to enforce. -28- NEPA requires that an agency considering any action that would have a significant impact on the environment prepare an EIS. The EIS must contain a "detailed statement" ________ including, inter alia, the environmental impacts of the ___________ proposed project, and all reasonable alternatives to the project. 42 U.S.C. 4332(C) (emphasis added). We previously emphasized the word "detailed" because "it connotes the careful, reasoned and fully explained analysis which we think Congress intended." Silva v. Lynn, 482 F.2d _____________ 1282, 1284 n.2 (1st Cir. 1973). Thus, the EIS helps satisfy NEPA's "twin aims": to ensure that the agency takes a "hard look" at the environmental consequences of its proposed action, and to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process. See Robertson, 490 U.S. at 350, 356; ___ _________ Baltimore Gas, 462 U.S. at 97. The EIS thus "helps insure _____________ the integrity of the process of decision," providing a basis for comparing the environmental problems raised by the proposed project with the difficulties involved in the alternatives. Silva v. Lynn, 482 F.2d at 1285. _____________ A. Consideration of Environmental Impacts A. Consideration of Environmental Impacts ______________________________________ In its EIS, the agency must "consider every significant aspect of the environmental impact of a proposed action," Baltimore Gas, 462 U.S. at 97 (quoting Vermont ______________ _______ -29- Yankee, 435 U.S. at 553), and "evaluate different courses of ______ action," Kleppe, 427 U.S. at 410. The EIS's discussion of ______ environmental impacts "forms the scientific and analytic basis for the comparisons" of alternatives, 40 C.F.R.  1502.16 (1995), which are "the heart" of the EIS, id. at  ___ 1502.14; see Part IV(B), infra. The discussion of impacts ___ _____ must include both "direct and indirect effects (secondary impacts) of a proposed project." Sierra Club v. Marsh, 976 _____________________ F.2d 763, 767 (1st Cir. 1992); 40 C.F.R. 1502.16(b). The agency need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action. Sierra Club v. Marsh, 976 _____________________ F.2d at 767. In this context, reasonable foreseeability means that "the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." Id. An environmental effect would be ___ considered "too speculative" for inclusion in the EIS if it cannot be described at the time the EIS is drafted with sufficient specificity to make its consideration useful to a reasonable decision-maker. Id. at 768. Nevertheless, ___ "[r]easonable forecasting . . . is . . . implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball -30- inquiry.'" Scientists' Inst. for Pub. Info. v. Atomic Energy _________________________________________________ Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973). ______ Plaintiffs contended in the district court that the Forest Service failed to adequately assess the impact of Loon Corp.'s planned expansion on Loon Pond. Plaintiffs listed a number of specific areas of concern. The district court found the Forest Service's consideration of environmental impacts to be adequate, and plaintiffs have not appealed this point. Accordingly, we need not pursue this issue here.  B. Consideration of Alternatives B. Consideration of Alternatives _____________________________ "[O]ne important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences" of a proposed action. Robertson, _________ 490 U.S. at 351. As one aspect of evaluating a proposed course of action under NEPA, the agency has a duty "to study all alternatives that appear reasonable and appropriate for study . . . , as well as significant alternatives suggested by other agencies or the public during the comment period." Roosevelt Campobello Int'l Park Comm'n v. United States EPA, ____________________________________________________________ 684 F.2d 1041, 1047 (1st Cir. 1982) (quotations omitted); Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, _____________________________________________ 462 (1st Cir. 1989); City of Carmel-By-The-Sea v. U.S. Dept. ________________________________________ of Transp., 95 F.3d 892, 903 (9th Cir. 1996). __________ As stated in the Council on Environmental Quality ("CEQ") regulations implementing NEPA, the consideration of -31- alternatives is "the heart of the environmental impact statement." 40 C.F.R. 1502.14. These implementing regulations are entitled to substantial deference. Robertson, 490 U.S. at 355 (citing Andrus v. Sierra Club, 442 _________ _____________________ U.S. 347, 358 (1979)). The regulations require that the EIS "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. 1502.14(a). It is "absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as 'the linchpin of the entire impact statement.'" NRDC v. Callaway, 524 F.2d 79, 92 (2d Cir. _________________ 1975) (citation omitted); see Silva v. Lynn, 482 F.2d at ___ ______________ 1285; All Indian Pueblo Council v. United States, 975 F.2d ____________________________________________ 1437, 1444 (10th Cir. 1992) (holding that a thorough discussion of the alternatives is "imperative"). "The 'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" Resources Ltd. ______________ v. Robertson, 35 F.3d 1300, 1307 (9th Cir. 1993) (quoting _____________ Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th __________________________________ Cir. 1992)); see Grazing Fields Farm v. Goldschmidt, 626 F.2d ___ __________________________________ 1068, 1072 (1st Cir. 1980) (Even the existence of supportive -32- studies and memoranda contained in the administrative record but not incorporated in the EIS cannot "bring into compliance with NEPA an EIS that by itself is inadequate."). Because of the importance of NEPA's procedural and informational aspects, if the agency fails to properly circulate the required issues for review by interested parties, then the EIS is insufficient even if the agency's actual decision was informed and well-reasoned. Grazing Fields Farm, 626 F.2d at ___________________ 1072; see Massachusetts v. Watt, 716 F.2d 946, 951 (1st Cir. ___ _____________________ 1983). C. The Requisite Level of Detail C. The Requisite Level of Detail _____________________________ One purpose of the EIS requirement is to "provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences." Northwest Resource Info. _________________________ Ctr., Inc. v. National Marine Fisheries Serv., 56 F.3d 1060, ______________________________________________ 1064 (9th Cir. 1995). What level of detail is sufficient depends on the nature and scope of the proposed action. Valley Citizens, 886 F.2d at 463; Mumma, 956 F.2d at 1520. ________________ _____ The discussion of environmental effects of alternatives need not be exhaustive. "[W]hat is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned," All Indian Pueblo __________________ Council, 975 F.2d at 1444 (quoting NRDC v. Morton, 458 F.2d _______ ______________ 827, 836 (D.C. Cir. 1972)); see also Carmel-By-The-Sea, 95 ________ _________________ -33- F.3d at 903, information sufficient for the agency to "[r]igorously explore and objectively evaluate" all reasonable alternatives. 40 C.F.R. 1502.14(a); All Indian __________ Pueblo Council, 975 F.2d at 1444. ______________ The courts have applied "a rule of reason in determining whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." Carmel-By-The-Sea, 95 F.3d at _________________ 899 (quotation omitted); see also Grazing Fields Farm, 626 _________ ____________________ F.2d at 1074; Massachusetts v. Andrus, 594 F.2d 872, 884 (1st _______________________ Cir. 1979); cf. Marsh, 490 U.S. at 373 (supplemental EIS). ___ _____ One aspect of this determination is whether the agency has gone "beyond mere assertions and indicate[d] its basis for them." Silva v. Lynn, 482 F.2d at 1287. The agency "must _____________ 'explicate fully its course of inquiry, its analysis and its reasoning.'" Massachusetts v. Andrus, 594 F.2d at 883 _________________________ (quoting Silva v. Lynn, 482 F.2d at 1284-85). The court must _____________ determine whether, in the context of the record, the agency's decision -- and the analysis on which it is based -- is too unreasonable for the law to permit it to stand. See Sierra ___ ______ Club v. Marsh, 976 F.2d at 769. We apply a rule of reason ______________ because courts should not "fly speck" an EIS and hold it insufficient based on inconsequential or technical deficiencies. Swanson v. U.S. Forest Service, 87 F.3d 339, _______________________________ 343 (9th Cir. 1996). "The statute must be construed in the -34- light of reason if it is not to demand what is, fairly speaking, not meaningfully possible. . . . But implicit in this rule of reason is the overriding statutory duty of compliance with impact statement procedures to the fullest extent possible." Scientists' Inst., 481 F.2d at 1092 __________________ (quotations omitted). The agency must "squarely turn[]" all "procedural corners" in its EIS. Citizens Awareness Network, __________________________ 59 F.3d at 290 (quoting Adams, 38 F.3d at 49). The question _____ whether a particular deficiency or combination is sufficient to warrant holding it legally inadequate, or constitutes merely a "fly speck," is essentially a legal question, reviewable de novo. Oregon Environmental Council v. Kunzman, _______ _______________________________________ 817 F.2d 484, 493 (9th Cir. 1987).  Applying these standards to the instant case, we conclude that the Forest Service has not rigorously explored all reasonable alternatives, in particular the alternative that Loon Corp. be required to build artificial water storage ponds, instead of withdrawing water for snowmaking from, and discharging water into, an "outstanding resource water" like Loon Pond. The adverse environmental impacts of using Loon Pond were before the agency, and more than one commenter proposed building artificial water storage ponds, a proposal that would, on its face, avoid some of those adverse impacts. One such commenter, Paul Beaudin of the Lincoln Committee of Concerned Citizens (LCCC), enclosed clippings pointing up -35- "the wisdom of [Loon Corp.'s] need to enact the LCCC's ____ proposal for water containment pond[s] high up on the Boyle Brook." JA, vol. II, Response to Public Comment on RDEIS at A-12. The LCCC proposal itself, made two months earlier, referred to a letter from the National Ecology Research Center recommending consideration of water storage alternatives other than Loon Pond, and enclosed a map indicating where up to three containment ponds could be installed. LCCC listed some nine advantages, including the cost-saving factor of servicing two-thirds to three-fourths of Loon Corp.'s snowmaking system by gravity feed.16 Instead of "rigorously explor[ing]" the alternative of using artificial water storage units instead of Loon Pond, the Forest Service's Final EIS did not respond to these comments at all. The agency did not in any way explain its reasoning or provide a factual basis for its refusal to consider, in general, the possibility of alternatives to using Loon Pond for snowmaking, or LCCC's reasonably  ____________________ 16. In addition to the Beaudin/LCCC proposal, plaintiff Dubois' comments also suggested that Loon Corp. build artificial water storage units, in his case underground.  This suggestion, requiring costly subterranean construction, may be more facially vulnerable than Beaudin/LCCC's; it may or may not alone have required an explicit response, however brief. But we need not address this question because we reverse based on the Beaudin/LCCC proposal. -36- thoughtful proposal in particular.17 This failure violated the Forest Service's EIS obligation under NEPA. See 40 ___ C.F.R. 1502.9(b) (1995); 42 U.S.C. 4332(C)(iii) (1994). The use of artificial storage ponds is not so facially implausible that it can be dismissed out of hand. The Forest Service, on another occasion, required the Sugarbush Ski Area in Vermont to construct, for its snowmaking operations, three artificial water storage ponds capable of holding 123.5 million gallons of water on 22.9 acres of private land. JA, vol. I, at 457, 465. This is 73% more than the 71 million gallons of water that the ROD estimates would be withdrawn from Loon Pond under the approved Loon Mountain expansion project. Beaudin/LCCC proposed constructing three similar ponds in the Boyle Brook area high up Loon Mountain. In addition, the record contains evidence that Loon Corp. owns 365 acres of private land at the base of the ski area, where similar storage ponds could be constructed, and that such ponds could be filled with water from the East Branch, which is typically high enough in the spring to contribute to flooding in downstream areas.  ____________________ 17. Aside from its preservation argument, see Part IV(D), ___ infra, the Forest Service merely argues that the LCCC _____ proposal was made to Loon Corp. before the RDEIS was published. However, the Forest Service does not suggest that Beaudin's comment letter -- responding to the Forest Service's RDEIS -- did not fairly refer to the prior LCCC proposal, or that this proposal was unknown to the Service. -37- Our conclusion is buttressed by NEPA's requirement that an agency consider and an EIS discuss "steps that can be taken to mitigate the adverse environmental consequences" of a proposed project. See Robertson, 490 U.S. at 351. Even ___ _________ though there is no requirement that the agency reach a particular substantive result, such as actually formulating and adopting a complete mitigation plan, the agency must discuss "the extent to which adverse effects can be avoided," i.e., by mitigation measures, "in sufficient detail to ensure ____ that environmental consequences have been fairly evaluated." Id. at 352. This duty -- coupled with the comments alerting ___ the agency to the environmental consequences of using Loon Pond for snowmaking and suggesting the containment pond solution -- required the Forest Service to seriously consider this alternative and to explain its reasoning if it rejected the proposal. Nor can the Forest Service claim that its failure to consider an alternative to using Loon Pond for snowmaking was a de minimis or "fly speck" issue. The record indicates __________ serious adverse consequences to Loon Pond if it is used "as a cistern," to use EPA's words, and at least a reasonable probability that the use of artificial storage ponds could avoid those consequences. The existence of this non-de __ minimis "viable but unexamined alternative renders [the Loon _______ EIS] inadequate." See Resources, Inc., 35 F.3d at 1307. ___ _______________ -38- After the matter had proceeded to court, counsel for the Forest Service argued that constructing artificial storage ponds large enough to serve as an alternative to using Loon Pond would not be a viable alternative for reasons that were conclusorily stated. The district court accepted this argument. But this "post hoc rationalization of _________ counsel" cannot overcome the agency's failure to consider and address in its FEIS the alternative proposed by commenters. State Farm, 463 U.S. at 50; see Burlington Truck Lines, Inc. ___________ ___ ____________________________ v. United States, 371 U.S. 156, 168 (1962); NRDC v. U.S. EPA, ________________ ________________ 824 F.2d 1258, 1286 n.19 (1st Cir. 1987). Such post hoc ________ rationalizations are inherently suspect, and in any event are no substitute for the agency's following statutorily mandated procedures. As noted supra, even if the agency's actual _____ decision was a reasoned one, the EIS is insufficient if it does not properly discuss the required issues. Grazing _______ Fields Farm, 626 F.2d at 1072. ___________ In sum, how "probing" an investigation NEPA requires of alternatives depends on the circumstances, including the nature of the action at issue. Valley ______ Citizens, 886 F.2d at 463. Thus, the reviewing court must be ________ flexible in evaluating the depth of analysis to require in an EIS, because, while NEPA "does not mandate particular results," it does require that the agency have adequately identified and evaluated a project's environmental -39- consequences. Robertson, 490 U.S. at 350. "NEPA's success _________ in large part arises from the use of legal concepts [that are flexible] such as 'reasonableness' and 'adequacy' that permit courts to adapt it successfully to so many different kinds of circumstances surrounding so many different kinds of governmental decisions." Valley Citizens, 886 F.2d at 463. _______________ Although in Valley Citizens we found the agency's _______________ analysis of alternatives "brief but adequate," 886 F.2d at 462, the contrast with the instant case is instructive. In Valley Citizens, we found that nothing in the record or in ________________ comments on the draft "point[ed] out any inaccuracy" in the agency's cost "descriptions" or in its "discussions" of other non-environmental considerations. Id. In contrast, in the ___ instant case, the final EIS contains no "description" or __ "discussion" whatsoever as to why an alternative source of water such as an artificially created storage pond would be impractical. The agency has discretion to balance competing concerns and to choose among alternatives, but it must legitimately assess the relative merits of reasonable alternatives before making its decision.  After a searching and careful review of the record in the instant case, we are not convinced that the Forest Service's decision was founded on a reasoned evaluation of the relevant factors, Marsh, 490 U.S. at 378, or that it _____ articulated a rational connection between the facts found and -40- the choice made, Baltimore Gas, 462 U.S. at 105. Hence, it _____________ acted arbitrarily and capriciously in granting Loon Corp.'s special use permit for the expanded ski resort. Moreover, because the Forest Service did not satisfy the requirement that it "rigorously explore and objectively evaluate" all reasonable alternatives,18 40 C.F.R. 1502.14(a), its decision was not in accordance with law.19 See 5 U.S.C.  ___ 706(2)(A). D. The Preservation Issue D. The Preservation Issue ______________________ The Forest Service argues that plaintiffs have not preserved their argument that the agency should have more seriously considered, as an alternative to Loon Pond, some other source for water and some other location to discharge  ____________________ 18. In addition to the question of an alternative to Loon Pond as a source of water or as a discharge point, plaintiff RESTORE has raised a second issue regarding alternatives. RESTORE asserts that the Forest Service should have considered alternative sites for the entire project, outside of the White Mountain National Forest. The district court found that such alternative sites were not appropriate for study because some draw from different markets and others do not offer the same type of skiing experience as the WMNF ski areas which have more terrain, higher mountains, more natural snow, and better facilities than their counterparts outside the WMNF. We agree. 19. Dubois also notes that the FEIS failed to disclose what he claims are numerous violations of state water quality standards, which "renders the FEIS unacceptable under NEPA." Dubois Brief at 16 n.11; see Northwest Indian Cemetery ___ ___________________________ Protective Ass'n v. Peterson, 764 F.2d 581, 587-88 (9th Cir. ____________________________ 1985), rev'd on other grounds sub nom. Lyng v. Northwest __________________________________ __________________ Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988). For _________________________________ discussion of the issue of state water quality standards, see ___ Part VII(C), infra. _____ -41- the effluent from Loon Corp.'s snowmaking pipes. It contends that plaintiffs failed adequately to raise their contentions during the public comment period, so they waived their right to pursue these challenges on their merits. The Forest Service argues that, "[i]f commenters could require agencies to undertake detailed comparative analyses merely by asserting the superiority of an alternative site, configuration or method, only the imaginations of project opponents would limit the length of EISs and the duration of the NEPA process." Forest Service Brief at 53. Raising the specter of catastrophe only obfuscates the real issues here: whether the Forest Service adequately considered alternatives to using Loon Pond as a vehicle for Loon Corp.'s snowmaking, with adequacy based on the reasonableness and practicality of the alternatives, and whether the Forest Service adequately explained in its FEIS why it decided against such alternatives. The Forest Service relies on Roosevelt Campobello: ____________________ "In order to preserve an alternatives issue for review, it is not enough simply to make a facially plausible suggestion; rather, an intervenor must offer tangible evidence that an __ alternative site might offer a substantial measure of _________________ superiority as a site." 684 F.2d at 1047 (emphasis added) (quotation omitted). The Forest Service's reliance on Roosevelt Campobello is misplaced. That case, and the _____________________ -42- precedents it relied on, dealt with a claim that the agency had not considered all appropriate alternative sites on which _____ to locate a particular project. Obviously, the number of potential locations for any project is infinite, and an agency cannot be expected to consider seriously every possible location before approving a project. In such a context, the agency is only required to consider "all alternatives which were feasible and reasonably apparent at the time of drafting the EIS." Id.; see also Seacoast Anti- ___ ________ ______________ Pollution League v. Nuclear Regulatory Comm'n, 598 F.2d 1221, _____________________________________________ 1229 (1st Cir. 1979) (Agency need not "ferret out every possible alternative, regardless of how uncommon or unknown.") (quoting Vermont Yankee, 435 U.S. at 551).  ______________ The situation in the instant case is wholly different. It is one thing to ask whether there are "known," "feasible," alternative sites on which to locate a project, _____ and a different matter to ask whether the Forest Service in the instant case should have considered an alternative means _____ of implementing the expansion of the Loon Mountain Ski Area - - a particular means of operation that would do less environmental damage -- without changing the site to another state or another mountain. Here, the Forest Service was alerted by commenters to the alternative of using artificial storage ponds instead of Loon Pond for snowmaking; but even without such comments, it should have been "reasonably -43- apparent" to the Forest Service, Roosevelt Campobello, 684 ____________________ F.2d at 1047, not "unknown," Seacoast Anti-Pollution League, _______________________________ 598 F.2d at 1229, that such an alternative existed. In the instant case, at least two commenters, Paul Beaudin of LCCC and plaintiff Dubois, provided notice to the Forest Service, informing it of the substance of their proposed alternative. Though not detailed, these comments submitted in response to the Forest Service's RDEIS made clear that the commenters thought the agency should consider some alternative source of water other than Loon Pond and some alternative place to discharge the water after it had gone through the snowmaking pipes. They argued that such an alternative would reduce the negative environmental impact on Loon Pond from depleting the pond's water and from refilling the pond with polluted water either from the East Branch or from acidic snowmelt. Dubois explicitly and Beaudin by reference suggested the possibility of new man-made storage units to accomplish these goals. These comments provided sufficient notice to "alert[] the agency" to the alternative being proposed and the environmental concern the alternative -44- might address.20 See Seacoast Anti-Pollution League, 598 ___ _______________________________ F.2d at 1229 (quoting Vermont Yankee, 435 U.S. at 553).  ______________ Because the comments to the EIS were sufficient to notify the agency of the potential alternatives, see Adams v. ___ ________ U.S. EPA, 38 F.3d 43, 52 (1st Cir. 1994), the district court ________ erred in concluding that plaintiffs were required to "offer[] specifics as to how to implement a suggested alternative water storage system." Memorandum and Order at 31. Such "specifics" are not required. As we reasoned in Adams, the _____ purpose of public participation regulations is simply "to provide notice" to the agency, not to "present technical or precise scientific or legal challenges to specific provisions" of the document in question. Adams, 38 F.3d at _____ 52. "It would be inconsistent with the general purpose of public participation regulations to construe the regulations strictly." Id.  ___ Moreover, NEPA requires the agency to try on its own to develop alternatives that will "mitigate the adverse environmental consequences" of a proposed project.  ____________________ 20. In Adams v. U.S. EPA, 38 F.3d 43 (1st Cir. 1994), we __________________ held that a plaintiff had sufficiently raised his proposal at the agency level by stating in his comment: "The EPA has not carried out the intent of Congress in relation to the [Act in question, citing specific statutory provisions]." Adams, 38 _____ F.3d at 52. This court held that that reference -- together with other comments discussing the detrimental impact of the proposed project on beaches and marine life -- was sufficient to "alert[] the EPA to [his] concern that the EPA had not adequately complied with the [statutory] mandates." Id.  ___ -45- Robertson, 490 U.S. at 351. "In respect to alternatives, an _________ agency must on its own initiative study all alternatives that _____________________ appear reasonable and appropriate for study at the time, and must also look into other significant alternatives that are called to its attention by other agencies, or by the public during the comment period afforded for that purpose." Seacoast Anti-Pollution League, 598 F.2d at 1230 (emphasis _______________________________ added).21 Particularly given this directive, the alert furnished by Beaudin and Dubois required exploration and discussion by the Forest Service of the idea that environmental damage might be reduced by the use of artificial storage ponds instead of Loon Pond for snowmaking purposes. Therefore, the district court should have rejected the Forest Service's argument that Dubois failed to adequately preserve the issue of alternatives. V. SUPPLEMENTAL EIS V. SUPPLEMENTAL EIS ________________ Plaintiffs also appeal the district court's conclusion that the Forest Service was not required, under NEPA, to prepare a supplemental EIS. The question of a supplemental EIS is premised on the dual purposes of the EIS:  ____________________ 21. In deciding whether an agency has adequately studied all reasonable alternatives, a reviewing court may consider "the extent and sincerity of the opponents' participation." Seacoast Anti-Pollution League, 598 F.2d at 1231. Here, it ______________________________ is apparent from the record that Dubois has treated this matter seriously, not as "a game," id. at 1229; he has not ___ "played dog in the manger with respect to alerting the agency" to his views regarding alternatives, id., in an ___ effort to "scuttle" the project, id. at 1231. ___ -46- to assure that the public who might be affected by the proposed project be fully informed of the proposal, its impacts and all major points of view; and to give the agency the benefit of informed comments and suggestions as it takes a "hard look" at the consequences of proposed actions. See ___ Robertson, 490 U.S. at 349, 356; 40 C.F.R. 1502.1, _________ 1502.9(a) (1995).  An agency "shall" prepare a supplemental EIS if, after issuing its latest draft EIS, "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. 1502.9(c)(1)(i) (1995). The use of the word "shall" is mandatory, not precatory. It creates a duty on the part of the agency to prepare a supplemental EIS if substantial changes from any of the proposed alternatives are made and the changes are relevant to environmental concerns. See Marsh, 490 U.S. at ___ _____ 372. Thus, as explained by CEQ, an additional alternative that has not been disseminated previously in a draft EIS may be adopted in a final EIS, without further public comment, only if it is "qualitatively within the spectrum of alternatives that were discussed" in the prior draft; otherwise a supplemental draft is needed. See Forty Most ___ Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18026, # 29b (1981).  -47- Plaintiffs argue that the project proposed as Alternative 6, appearing for the first time in the Final EIS, embodies "substantial changes" from any of the alternatives proposed in the prior drafts of the EIS, and that those changes are "relevant to environmental concerns." See 40 ___ C.F.R. 1502.9(c)(1)(i). Therefore, plaintiffs assert that, by not describing Alternative 6 in a supplemental EIS -- which would give the public an opportunity to comment on it and give the Forest Service the benefit of those comments in its consideration of the environmental impact of Alternative 6 -- the Forest Service collided with both the public information and the agency guidance objectives of NEPA. In response, defendants argue that plaintiffs' interpretation of the previously discussed alternatives is incorrect, because Alternative 6 is merely a scaled-down modification of Alternative 2 which, as proposed in two phases in the RDEIS, would have been far larger and far more intrusive on the environment than the new preferred Alternative 6. Plaintiffs reply that only Phase I and not Phase II of Alternative 2 was seriously considered and analyzed prior to the development of Alternative 6 in the final EIS.22 Defendants deny this assertion.  ____________________ 22. Plaintiffs point to several instances where the FEIS stated that further environmental analysis would be conducted in the future if and when Loon Corp. sought permission to proceed with Phase II. -48- We conclude, based on the record in this case, that a supplemental EIS was required. The scope of review of a reviewing court is the APA's "arbitrary and capricious" standard. Marsh, 490 U.S. at 375-76; see Part III, supra. _____ ___ _____ The Court in Marsh was especially deferential to the _____ "informed discretion of the responsible federal agencies," due to the "high level of technical expertise" required in that case to analyze the relevant documents regarding soil composition and a dam's impact on downstream turbidity. Marsh, 490 U.S. at 377, 379. In the instant case, however, _____ nothing in the FEIS indicates that any such technically complex scientific analysis would be required in order for this court to determine that Alternative 6 involves a "substantial change" from the prior proposals at Loon Mountain. Alternative 6, adopted by the Forest Service as its preferred alternative in the final EIS, does not fall "within the spectrum of alternatives" that were considered in previous drafts, even if Phase II of Alternative 2 had been adequately analyzed prior to the FEIS. Alternative 6 entails a different configuration of activities and locations, not merely a reduced version of a previously-considered alternative. Phase II of Alternative 2 proposed expanding the ski area primarily on land that is not within the current permit area; in contrast, Alternative 6 squeezes much of its -49- expansion into that current permit area. To accomplish this, Alternative 6 widens existing trails so as to eliminate buffers that currently separate the trails. It also envisions a 28,500-square-foot base lodge facility within the existing permit area. And it develops ski trails, access roads and lifts on land that the prior alternatives had left as a woodland buffer between the old ski area and the proposed expansion area. These are substantial changes from the previously-discussed alternatives, not mere modifications "within the spectrum" of those prior alternatives. It would be one thing if the Forest Service had adopted a new alternative that was actually within the range of previously considered alternatives, e.g., simply reducing the scale of ____ every relevant particular. It is quite another thing to adopt a proposal that is configured differently, in which case public commenters might have pointed out, if given the opportunity -- and the Forest Service might have seriously considered -- wholly new problems posed by the new configuration (even if some of the environmental problems present in the prior alternatives have been eliminated). Nor can it be said that these changes are not "relevant to environmental concerns." They could very well have environmental impacts that the Forest Service has not yet considered, simply based on their more compact physical location. Indeed, the RDEIS said the Forest Service had -50- considered expansion alternatives such as "other configurations on the existing permit area," but these alternatives "were eliminated from detailed analysis because they were not reasonable or feasible alternatives." JA, vol. I, at 145-46. Moreover, the plan selected, Alternative 6 in the FEIS, would require that four million gallons more water be withdrawn annually for snowmaking, compared with the closest alternative among the five previously given detailed consideration. Whether or not viewed in the graphic terms described by plaintiff RESTORE -- four million gallons annually is enough water "to create a lake the size of a football field more than eleven feet deep," RESTORE Brief at 33 -- this change can be expected to have a significant enough effect on the environment that additional analysis through a supplemental EIS would be required. Cf. Roosevelt ___ _________ Campobello, 684 F.2d at 1055 (requiring a supplemental EIS to __________ consider newly completed studies regarding the small risk of a major oil spill). We conclude, based on the record in this case, that Alternative 6 entails substantial changes from the previously proposed actions that are relevant to environmental concerns, and that the Forest Service did not present those changes to the public in its FEIS for review and comment. Accordingly, the Forest Service's failure to prepare a supplemental EIS was arbitrary and capricious.  VI. EXECUTIVE ORDER 11,990  VI. EXECUTIVE ORDER 11,990  ______________________ -51- Plaintiffs contend that the Forest Service's failure to adequately consider alternatives to the use of Loon Pond and failure to develop adequate mitigation measures violates Executive Order 11,990, as well as NEPA. The district court rejected this argument on essentially the same grounds as the NEPA argument.  On appeal, the government contends that the Executive Order is not enforceable, at least by private parties, because NEPA did not confer rulemaking authority on the President. Plaintiffs argue that the Executive Order is accorded the full force and effect of a statute or regulation, enforceable under the APA. We have not previously decided this precise issue, nor need we decide it now. Even assuming that the Executive Order is enforceable under the APA, it does not apply to the circumstances of this case. The Executive Order states that federal agencies, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use. Exec. Order No. 11,990, 2. There is no dispute that Loon Pond is a "wetland." The Forest Service, however, contends -52- that the Loon Corp. expansion plan does not constitute "new construction." The Executive Order defines "new construction" to include "draining, dredging, channelizing, filling, diking, impounding, and related activities." Id.,  ___ 7(b). Dubois claims that the use of Loon Pond as a source of water for snowmaking and the discharge of used water from the snowmaking pipes into Loon Pond constitute "draining" and "filling" within the meaning of 7(b). We agree with the Forest Service that the mere expansion of a previously ongoing withdrawal of water from or addition of water to a reservoir ordinarily does not fall within the ambit of the Executive Order's "new construction" requirement.23 This conclusion is dictated by the plain meaning of the phrase "new construction," which does not ordinarily encompass the mere expansion of an ongoing activity, unless that activity itself constituted "new construction." Likewise, in common usage, the words "draining" and "filling" generally refer to activities that eliminate a wetland to convert it to another use, not to the expansion of an activity that already adds water to or  ____________________ 23. It is conceivable, of course, that an expansion of an already existing activity could fall within the ambit of the _____ Executive Order's "new construction" requirement. This could occur if the expansion effectuated a qualitative change in the nature of the activity, rather than a mere quantitative enlargement of that activity. On the record before us in the instant case, we cannot say that plaintiffs have demonstrated such a qualitative change. -53- withdraws water from an existing pond. Our reading is buttressed by common sense: one would not ordinarily think, without more, that a federal agency operating a dam on federal land would be required, by the Executive Order, to issue notices and make findings every time water is added to or withdrawn from the dam (assuming that the dam has already met all legal requirements to begin operation). Applying the foregoing analysis of the Executive Order to the record in the instant case, we conclude that the situation here is more akin to an expansion of ongoing activities than to "new construction." The town of Lincoln is already using Loon Pond as a source of town water. And Loon Corp. has been using the Pond as a source of water for snowmaking, to a depth of four to six feet on the average. It is true that the extent of this intrusion is less than would be the case under the proposed expansion. But plaintiffs did not challenge these currently-existing intrusions, and they have not demonstrated a factual basis for their conclusion that there is something qualitatively "new" about the proposed drawdown. Thus, the proposed Loon Corp. expansion project -- by drawing down a substantial additional amount of water from Loon Pond and refilling it with East Branch water or with acidic runoff -- does not satisfy the definition of "new construction" within the meaning of Executive Order 11,990, even though it constitutes -54- a major action with significant impact on the environment, triggering NEPA's EIS requirements. VII. THE CLEAN WATER ACT ISSUES VII. THE CLEAN WATER ACT ISSUES __________________________ The Clean Water Act (CWA) was "a bold and sweeping legislative initiative," United States v. Commonwealth of ___________________________________ P.R., 721 F.2d 832, 834 (1st Cir. 1983), enacted to "restore ____ and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a) (1994). "This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, 'the word "integrity" . . . refers to a condition in which the natural structure and function of ecosystems [are] maintained.'" United States v. Riverside ___________________________ Bayview Homes, Inc., 474 U.S. 121, 132 (1985) (quoting H.R. ___________________ Rep. No. 92-911, at 76 (1972)). In contrast to NEPA's focus on process, the CWA is substantive, focusing upon the "integrity of the Nation's Waters, not the permit process." Massachusetts v. Watt, 716 F.2d at 952 (quoting Weinberger v. _____________________ _____________ Romero-Barcelo, 456 U.S. at 314).  ______________ The most important component of the Act is the requirement that an NPDES permit be obtained, Commonwealth of _______________ P.R., 721 F.2d at 834; see 33 U.S.C. 1342 (1994), which we ____ ___ discuss in Part VII(B), infra. In addition, the CWA requires _____ states to adopt water quality standards which protect against degradation of the physical, chemical, or biological -55- attributes of the state's waters. 33 U.S.C. 1251(a), 1313(d)(4)(B) (1994); 40 C.F.R. 131.12 (1995). This is discussed in Part VII(C), infra.24 Before turning to the _____ merits of these issues, however, we must first address the defendants' jurisdictional arguments. A. Jurisdictional Issues A. Jurisdictional Issues _____________________ As a threshold matter, defendants argue that we need not address the merits of plaintiffs' claim that an NPDES permit was required, because the court lacks subject matter jurisdiction. Defendants argue that the NPDES permit issue is not properly raised because plaintiffs failed to provide notice of their intentions to sue Loon Corp.25 Defendants contend that Section 505(b) of the CWA "prohibits citizen plaintiffs from filing [suit to enforce the CWA's NPDES permit requirement] until at least 60 days after they have provided notice of their intent to sue" to EPA, to the State in which the alleged violation occurred, and to "any  ____________________ 24. The third major aspect of the CWA is the use of industry-specific effluent standards to control the quality of effluent that can be attained using available pollution control technology. 33 U.S.C. 1311, et seq. This aspect _______ of the CWA is not in issue in this litigation. 25. The Forest Service also asserts that no claim can stand against it as a defendant because EPA regulations place the responsibility for obtaining an NPDES permit on the "operator" of a covered activity; the Forest Service is merely the owner of the land on which the activity takes place. This argument is unavailing: if an NPDES permit were required, as plaintiffs contend, then the Forest Service should not have granted a special use permit to Loon Corp. until the NPDES permit had been obtained. -56- alleged violator" of the standard, limitation, or order. Forest Service Brief at 37; see 33 U.S.C. 1365 (b)(1) ___ (1994). It is undisputed, however, that Dubois, the original plaintiff, did provide notice to the Forest Service of his intent to sue. The Forest Service was the only defendant that he did sue; and he alleged only that the Forest Service, not Loon Corp., had violated federal statutes, including the CWA, in approving Loon Corp.'s expansion plan. The district court therefore had jurisdiction to hear Dubois' claim that the Forest Service had approved the project illegally by not ensuring that an NPDES permit was obtained. His properly raised NEPA claim subsumed the CWA claim.26 Thus, even if Loon Corp.'s lack of notice did deprive us of jurisdiction to hear Dubois' claim that the Forest Service violated the CWA by failing to require an NPDES permit before approving the special use permit, this  ____________________ 26. Thereafter, Loon Corp. chose to intervene in the action in order to protect its business interests. When Loon Corp. voluntarily intervened in an ongoing action, it "step[ped] into the shoes" of the original defendants -- who were properly before the court -- insofar as the 60-day notice is concerned. Kitlutsisti v. ARCO Alaska, Inc., 592 F. Supp. ________________________________ 832, 842 (D. Alaska 1984), vacated as moot, 782 F.2d 800 (9th _______________ Cir. 1986); cf. E.H. Ashley & Co. v. Wells Fargo Alarm ___ ______________________________________ Servs., 907 F.2d 1274, 1277 (1st Cir. 1990) (When insurer, as ______ subrogee, steps into shoes of insured, insurer "has no greater rights against a third party" than the insured had; insurer "was on constructive notice of the provisions of [insured's] contract [with third party] because it occupies the shoes of its insured."). -57- would not remove the NPDES permit issue from the case.27 Regardless of whether any of the remedies provided in the CWA would be available to Dubois in light of his asserted failure to provide proper notice of his intent to sue, this court would still have the authority and the obligation to decide, under NEPA, whether an NPDES permit is required in this case. See Keating v. FERC, 927 F.2d 616, 624 (D.C. Cir. 1991). ___ ________________ This is because, as noted supra, NEPA requires the Forest _____ Service to identify in its EIS all federal permits that the  ____________________ 27. Nor is RESTORE precluded from pursuing its claims on the ground that it did not notify defendants of its intent to bring suit. RESTORE was an intervenor, merely joining a suit that was already in esse; it did not bring a new suit. As _______ such, RESTORE was not required to notify Loon Corp. of its intent to bring suit. We need look no further than the statutory language itself: "No action may be commenced" _________ without the requisite notice. 33 U.S.C. 1365(b). RESTORE did not "commence" this action; it intervened in an existing action. Moreover, the purpose of the notice requirement -- to give the parties an opportunity to resolve the problem administratively or to settle the matter without resort to the courts, before the parties have assumed adversarial positions brought about by litigation -- no longer applied at the time RESTORE intervened in the ongoing suit. Hence, the purpose of the notice requirement would not be served by applying it to an intervenor like RESTORE. Nor are we faced with the kind of equitable considerations discussed in Hallstrom v. Tillamook County, ______________________________ 493 U.S. 20, 29 (1989), in holding an original plaintiff strictly to the notice requirement. Unlike the original plaintiff, who has full control over when to file the suit, an intervenor like RESTORE has no control over the timing of the initial action. Because this action was already being litigated on an expedited schedule, RESTORE could well have lost the opportunity to protect its interests if it had served a notice of intent to sue and then waited 60 days before intervening in the expedited case. The balance of equities here favors permitting RESTORE to pursue its claims. -58- project needed in order to comply with applicable federal law. 40 C.F.R. 1502.25(b). There is no question that plaintiffs have properly invoked the jurisdiction of this court, pursuant to 28 U.S.C. 1331 (general federal question jurisdiction), to challenge defendants' failure to comply with NEPA in this regard. For these reasons, we reject defendants' jurisdictional argument and turn to the merits. B. NPDES Permit B. NPDES Permit ____________ Section 301(a) of the Clean Water Act prohibits the "discharge of any pollutant" into navigable waters from any "point source" without an NPDES permit. 33 U.S.C. 1311(a) (1994). Plaintiffs argue that the Forest Service violated Section 301(a) by failing to obtain an NPDES permit before approving Loon's plan to remove water from the East Branch, use it to pressurize and prevent freezing in its snowmaking equipment, and then discharge the used water into Loon Pond. Section 301(a) prohibits the "discharge of any pollutant by any person" except as authorized pursuant to a permit issued under the Act. Id.; see 33 U.S.C. 1342, 1344 (1994); ___ ___ Commonwealth of P.R., 721 F.2d at 835. The term "discharge ____________________ of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C.  1362(12)(A) (1994). The definition of a "pollutant" includes "dredged spoil, solid waste, . . . sewage, garbage, . . . biological materials, . . . heat, . . . sand, . . . and -59- agricultural waste." 33 U.S.C. 1362(6) (1994). "Navigable waters" is defined as "the waters of the United States." 33 U.S.C. 1362(7) (1994). The district court found and the parties agree that Loon Pond is a water of the United States, that the East Branch water discharged from Loon Corp.'s snowmaking pipes into Loon Pond is a pollutant within the meaning of the CWA,28 and that the pipe discharging the water into Loon Pond is a point source. The question, then, is whether there is an "addition" of pollutants to Loon Pond when water containing pollutants is discharged from Loon Corp.'s snowmaking equipment into Loon Pond. The district court answered this question in the negative. The court reasoned that the intake water from the East Branch of the Pemigewasset River and the water in Loon Pond are all part of "a singular entity, 'the waters of the ___ United States,'" and therefore that "the bodies of water are not to be considered individually in this context." Memorandum and Order at 13. Because it interpreted the East Branch and Loon Pond to be part of the same "singular entity," the court concluded that the transfer of water from the East Branch into Loon Pond would not constitute an  ____________________ 28. It contains at least the same pollutants that were present in the water from the East Branch before intake into the pipes. -60- "addition" into the Pond, at least if the pipes added no new pollutants.29 Id. ___ There is no basis in law or fact for the district court's "singular entity" theory. The error in the court's reasoning is highlighted by an analogy the court drew: it hypothesized a pond in which "we place a pipe . . . and we pump the pond water from the bottom to the surface. No one would reasonably contend that internal pumping causes an 'addition' of pollutants to the pond. Instead, we would consider the pumping to be a redistribution of pollutants from one part of the pond to another." Id. at 12. Such a ___ situation is not at all analogous to the instant case. There is no barrier separating the water at the top of a pond from the water at the bottom of the same pond; chemicals,  ____________________ 29. This premise is a disputed issue. Plaintiffs argue that allowing the water from the East Branch to flow through the pipes before discharge into Loon Pond results in the addition of not insignificant amounts of oil and grease. Defendants dispute this, which ordinarily would result in a reversal of summary judgment on this issue. See Fed. R. Civ. P. 56(c). ___ Defendants argue, however, that plaintiffs failed to raise this factual dispute before the agency in timely fashion, so it is not preserved for our review. Plaintiffs respond that they could not have raised this dispute prior to the publication of the FEIS because the Forest Service did not even collect the data regarding oil and grease until after issuing its decision (the ROD). We need not resolve this dispute; we hold infra that, even if the pipes add no new _____ pollutants, the transfer of East Branch water through Loon Corp.'s privately owned pipes and its discharge into Loon Pond constitutes a point source discharge of at least some pollutants into the Pond, thereby requiring an NPDES permit. Upon remand, the parties are not foreclosed from presenting their factual disputes to the EPA if they decide to contest the issuance of that permit. -61- organisms, and even heat are able to pass from the top to the bottom or vice versa, at rates determined only by the laws of __________ science.  In contrast, the transfer of water or its contents from the East Branch to Loon Pond would not occur naturally. This is more analogous to the example the district court gave from the opposite end of the spectrum: where water is added "from an external source" to the pond and an NPDES permit is required. Id. As in this converse example, the East Branch ___ and Loon Pond are not the same body of water; the East Branch is indeed a source "external" to Loon Pond. We can take judicial notice that the Pemigewasset River was for years one of the most polluted rivers in New England, the repository for raw sewage from factories and towns. It emitted an overwhelming odor and was known to peel the paint off buildings located on its banks. Yet, under the district court's theory, even if such conditions still prevailed, a proposal to withdraw water from the Pemigewasset to discharge it into Loon Pond would be analogous to moving water from the top to the bottom of a single pond; it would not constitute an "addition" of pollutants "from an external source" because both the East Branch and Loon Pond are part of the "singular" waters of the United States.30 The district court apparently  ____________________ 30. Again, we leave to one side the possibility that additional pollutants, such as oil and grease, would be added when the water flowed through the system of pipes. If that -62- would reach the same conclusion regardless of how polluted the Pemigewasset was or how pristine Loon Pond was. We do not believe Congress intended such an irrational result. The district court's analysis also ignores the fact that water would pass through Loon Corp.'s privately owned pipes on its way from the East Branch to Loon Pond. Thus, nature would not regulate -- and neither the Forest Service nor the court could know in advance -- whether any pollutants would be added to the water as it passes through the pipes. The district court concluded that the East Branch water does not "lose[] its status as navigable waters" even if it is "commercially exploited," Memorandum and Order at 18, as long as Loon Corp. does not "plan[] to add any additional pollutants to the East Branch water that it intends to discharge into Loon Pond." Id. at 10. The court does not ___ indicate whether anyone assures compliance with the "plan" that no pollutants be added during the commercial exploitation, or if so who makes that determination and how it is made, at a time when the project is still just a proposal and not yet a fait accompli. Cf. Massachusetts v. ___ ________________ Watt, 716 F.2d at 952. The district court's analysis would ____ apply equally if the water passed through a paper mill on its way to Loon Pond, instead of through snowmaking pipes. And the analysis is equally unpersuasive in either circumstance.  ____________________ were true, that alone would require an NPDES permit. -63- Either way, the water leaves the domain of nature and is subject to private control rather than purely natural processes. As such, it has lost its status as waters of the United States.  Other courts have held that an NPDES permit is required before pollutants may be moved from one body of water of the United States to another. See Dague v. City of ___ _________________ Burlington, 935 F.2d 1343, 1354-55 (2d Cir. 1991), rev'd in __________ _________ part on other grounds, 505 U.S. 557 (1992); Committee to Save _____________________ _________________ Mokelumne River v. East Bay Mun. Util. Dist., 13 F.3d 305, ______________________________________________ 308-09 (9th Cir. 1993), cert. denied, 115 S. Ct. 198 (1994). ____________ The Eleventh Circuit has held that such a permit is required in order to move dredge materials by a point source within ______ the same water body. United States v. M.C.C. of Florida, ________ _____________________________________ Inc., 772 F.2d 1501, 1506 (11th Cir. 1985). ____ Even the Forest Service does not support the district court's conclusion that mere transfers of water from one water body to another, without more, never result in an addition of pollutants to waters of the United States. The Forest Service recognizes that "[i]t is possible that water transferred between unrelated water bodies of different water quality would properly be regarded as losing its status as 'water [sic] of the United States,'" requiring a Section 402 permit. Forest Service Brief at 47. We agree. The Forest Service qualifies this insight, however. It argues that Loon -64- Corp. "moves water between hydrologically connected water bodies containing water of like quality" which, therefore, does not "introduce pollutants 'from the outside world' into the receiving waters." Id. Accordingly, the Forest Service ___ argues no permit is required. We disagree with the Forest Service's qualification. First, there is nothing in the statute evincing a Congressional intent to distinguish between "unrelated" water bodies and related or "hydrologically connected" water bodies. The CWA simply addresses "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. 1362(12)(A). Nor is the purpose of the CWA served by means of such a distinction. If anything, the purpose would be better served by a distinction between de minimis __ _______ transfers of water and transfers which add some not insignificant amount of pollutants to the transferee water body. But no such distinction appears in the statute, and to imply one would thrust some agencies with no expertise on environmental issues into the role of deciding whether the CWA's environmental protections should even be considered.31  ____________________ 31. As discussed in Part VII(C), infra, in another context, _____ the Forest Service argues that it is the EPA, not the Forest Service, that has the expertise and the congressional mandate to determine whether a proposed project meets state water quality standards. We agree. The availability of EPA to perform this task is another reason why an NPDES permit should be obtained before the Forest Service approves the Loon Corp. expansion plan. See note 32 and accompanying ___ text, infra. _____ -65- More compellingly, the Forest Service's "hydrological connectedness" proposal ignores a fundamental fact about water: the direction of flow. It is true that Loon Pond and the East Branch of the Pemigewasset River are "hydrologically connected" in the sense that water from the Pond flows down and eventually empties into the River. But ____ water from the East Branch certainly does not flow uphill ______ into Loon Pond, carrying with it the pollutants that have undisputedly accumulated in the East Branch water from some of the other sources of water entering the East Branch from upstream. Under such circumstances, defendants cannot credibly argue that these water bodies are so related that the transfer of water from the East Branch to Loon Pond is ____ __ not an "addition" of water from one of the "waters of the United States" to another. We therefore reject the Forest Service's "hydrological connectedness" proposal. Likewise, we reject its assertion, unsupported by the record, that in some general sense the two bodies of water are "of like quality." First, this is the kind of substantive question to which the EPA would apply its technical expertise in deciding whether to issue an NPDES permit and what conditions to attach to such a permit in order to protect water quality. It is not the kind of threshold question that the Forest Service or this court -66- should address in deciding whether to subject the Loon Corp. expansion proposal to the NPDES permitting process.  Second, the Forest Service does not contest plaintiffs' assertion that there are at least some pollutants in the East Branch that do not exist naturally in Loon Pond. The Final EIS itself noted that the East Branch has been designated by the New Hampshire legislature as a Class B Waterway, a lower quality designation than the Class A quality rating of Loon Pond. JA, vol. II, FEIS at 91. The difference in classifications -- the East Branch as a Class B waterway, Loon Pond as Class A -- evinces a higher quality level for the Pond than for the River, and belies the Forest Service's assertion that the two bodies of water are "of like quality." Even if the East Branch were rated in the same general class as Loon Pond (Class A), that would not mean the two bodies of water were identical in quality, such that an NPDES permit would be unnecessary. The East Branch contains different organisms than Loon Pond, inter alia, Giardia ___________ lambia. Loon Pond is also colder overall than the East Branch, and its lower depths are significantly colder. The two bodies of water also have different chemistries, especially the low level of phosphorus in Loon Pond, which affects its biological composition. Nor has the Forest Service argued that all such pollutants would be eliminated ___ -67- before any East Branch water would be pumped up to refill Loon Pond after depletion by Loon Corp.'s snowmaking. The Service cannot say, therefore, that the discharge of East Branch water into Loon Pond would not result in "any pollutants" being added to the Pond. 33 U.S.C.  1362(12)(A). Aside from the difficulty of defining a general concept such as "of like quality," it would defeat the purpose of the CWA's permit process to interpret the statutory language "discharge of any pollutant," 33 U.S.C.  ___ 1311(a), to be implicitly qualified by the phrase "except when the transferee body of water is of like quality." The Forest Service is simply wrong to analogize the present situation to a dam that merely accumulates the same water, ____ see National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 175 ___ ____________________________________ (D.C. Cir. 1982), or a pump storage facility that stores water from one source in a different place, see National ___ ________ Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 589-90 ______________________________________ (6th Cir. 1988), as distinguished from moving different water from one flowing water body into another stationary, colder body. We cannot allow such a watering down of Congress' clear statutory protections. We hold that the Pemigewasset River and Loon Pond are two distinct "waters of the United States," and that the proposed transfer of water from one to the other constitutes -68- an "addition." Where, as is undisputed here, the discharge is through a point source and the intake water contains pollutants, an NPDES permit is required. The Forest Service's determination to the contrary was arbitrary and capricious and not in accordance with law. See 5 U.S.C.  ___ 706(2)(A). C. Violation of State Water Quality Standards C. Violation of State Water Quality Standards __________________________________________ Plaintiff Dubois claims that state water quality standards are violated because of the quality of water that would enter Loon Pond. This water would come from one of two sources: some of it would come from snowmelt that replaces the water that Loon Corp. has pumped out of Loon Pond to make snow; and some would be water that Loon Corp. has taken from the East Branch for snowmaking and then discharged into Loon Pond. Dubois contends that Loon Corp.'s snowmaking operations pose an impermissible threat to Loon Pond because influxes of East Branch water and snowmelt -- the two principal sources of water to refill the Pond -- could alter the Pond's naturally occurring pH, bacteria, oil and grease, and turbidity levels. On the merits of the water quality standards issue, Dubois argues that the CWA requires states to adopt water quality standards which protect against degradation of the physical, chemical, or biological attributes of the state's waters. 33 U.S.C. 1251(a), 1313(d)(4)(B); 40 C.F.R.  -69- 131.12. The greatest protection is afforded to Outstanding Resource Waters, including Loon Pond, as to which no degradation is permitted. 40 C.F.R. 131.12(a)(3); N.H. Code Admin. R. Env-Ws 437.06. Dubois contends that the ski resort's proposal to draw down a significant amount of water changes the physical structure of Loon Pond; that refilling it with East Branch water containing phosphorus (and through pipes that might contain oil and grease) or with acidic runoff would change the Pond's chemical composition; and that the transfer of organisms such as Giardia lambia and chemicals such as phosphorus into the Pond would alter its biological attributes. Because we hold infra that Dubois _____ cannot, in a challenge to the Forest Service's FEIS, collaterally attack the state's certification of compliance with state water quality standards, we need not reach the merits of the state water quality standards issue. Defendants argued in the district court that Dubois' CWA claim was not properly presented, that Dubois should have raised his objections by exhausting various administrative remedies and filing a timely appeal in the New Hampshire Supreme Court. They argued that the federal agency (Forest Service) and the federal court lack the authority to review independently and determine the validity of requirements imposed under state law or in a state's 401 certification, see 33 U.S.C. 1371(c)(2)(A) (1994), and that ___ -70- such authority is expressly delegated to the states, 33 U.S.C. 1341(a) (1994).  The district court agreed. It held that, "[i]f the plaintiffs in this case were dissatisfied with the state's  1341 certification, they could have challenged the certification by exhausting state administrative remedies and filing a timely challenge in the New Hampshire Supreme Court." Memorandum and Order at 21-23. That is true insofar as it goes. The question, however, is whether a state court action is the plaintiffs' only recourse, or whether, in the ____ alternative, they had a right to challenge in federal court the federal agency's issuance of a federal permit in reliance on the state certification, where the basis for their challenge is that the project fails to meet the minimum standards of the federal Clean Water Act. Defendants may be correct that the cases they rely upon hold that the state courts are the only fora in which to challenge whatever requirements the state adds, beyond the ____ ______ minimum required by the CWA. Those cases do not, however, deprive the federal courts of jurisdiction to hear a claim that defendants have violated the floor level of clean water _____ requirements imposed by the CWA, i.e., the requirements which ____ the state regulations share with the federal CWA. _____ -71- The cases relied upon by the defendants and by the district court32 dealt with challenges to the state's imposition of more stringent controls on a project's water ______________ pollution effluent. Such cases relied on the language of the CWA itself, as well as basic principles of federalism, to support their holdings that the CWA "empower[s]" the states "to set more stringent water quality standards than those set by the Act and its attendant requirements" to prevent water pollution. Marathon Dev. Corp., 867 F.2d at 99; see _____________________ ___ Commonwealth of P.R., 721 F.2d at 834 n.3; Roosevelt ______________________ _________ Campobello, 684 F.2d at 1056. However, the states may not __________ set standards that are less stringent than the CWA's. See ___ Marathon Dev. Corp., 867 F.2d at 99. Simply put, the CWA ____________________ provides a federal floor, not a ceiling, on environmental protection. If a state seeks to approve a standard that is less stringent than the federal CWA's floor, or seeks to apply a standard in a way that is otherwise invalid under federal law, then federal agencies and federal courts are _______ obligated to resolve the application of the federal CWA in  ____________________ 32. They rely particularly on our Roosevelt Campobello _____________________ decision, 684 F.2d at 1056, but also on Puerto Rico Sun Oil, ____________________ 8 F.3d at 81; United States v. Marathon Dev. Corp., 867 F.2d ____________________________________ 96, 102 (1st Cir. 1989); Lake Erie Alliance for Protection of ____________________________________ Coastal Corridor v. U.S. Army Corps of Eng'rs, 526 F. Supp. ______________________________________________ 1063, 1074 (W.D.Pa. 1981), aff'd mem., 707 F.2d 1392 (3d __________ Cir.), cert. denied, 464 U.S. 915 (1983). All of these cases ____________ involved states imposing more stringent controls on water pollution than required by federal law. -72- any case that properly comes before them. See Keating v. ___ ___________ FERC, 927 F.2d at 624. ____ The Forest Service asserts another defense, also relied on by the district court, which carries more force. Section 511(c)(2)(A) of the CWA precludes federal agencies from invoking NEPA to authorize their review of "the adequacy of any certification under section [401]." 33 U.S.C.  1371(c)(2)(A). Dubois points out that, in the circumstances of this case, Section 511(c)(2)(A) does not apply when the discharge of pollutants in question is not regulated by effluent limitations established under CWA Sections 301(b) and 302, 33 U.S.C. 1311(b) & 1312, or by an applicable standard of performance under CWA Sections 306 and 307, 33 U.S.C. 1316 & 1317. Dubois Brief at 27; see 33 U.S.C.  ___ 1341(a). Such effluent limitations and standards are established in NPDES permits for point source dischargers. 33 U.S.C. 1311(b), 1312, 1316, 1317, 1362(11). Dubois then tries to bootstrap the fact that the Forest Service failed to apply for an NPDES permit into a circumstance that renders Section 511(c)(2)(A) inapplicable. Dubois Brief at 27-28. His argument is without merit.  It is true that the Forest Service was obligated to obtain an NPDES permit before permitting Loon Corp. to expand its ski resort. See Part VII(B), supra. However, the ___ _____ violation of that statutory obligation is a separate issue -73- from the state water quality standards issue. For purposes of the latter, the fact is that there do not exist any effluent limitations under CWA Sections 301(b) or 302 nor any standards of performance under CWA Sections 306 or 307 that apply to the discharge of East Branch water and pollutants into Loon Pond. Therefore, whether or not the Forest Service actually obtained the required NPDES permit, Section 511(c)(2)(A) applies, and Dubois' challenge to the adequacy of the state's Section 401 certification may not proceed in this court.  As the federal defendants argued in their brief and as we held in Roosevelt Campobello, 684 F.2d at 1056, Dubois' ____________________ challenge must be addressed as part of EPA's "independent obligation to ensure that EPA-issued NPDES permits meet state water quality standards." Forest Service Brief at 29; see 33 ___ U.S.C. 1311(b)(1)(C) (1994).33 If, upon remand, EPA determines that a permit is appropriate, with or without  ____________________ 33. The availability of EPA to perform this task is another reason supporting our holding in Part VII(B), supra, that an _____ NPDES permit is required. See supra note 30. The federal ___ _____ CWA requires that any state certification ensure that the minimal federal standards have been adhered to. The government is correct that the Forest Service possesses neither the congressional mandate nor the expertise to second-guess state water quality certifications. But EPA does; and the CWA envisions that EPA make those assurances in the context of deciding whether to issue an NPDES permit. -74- conditions or limitations,34 and if plaintiffs disagree with EPA's decision, then they may challenge such decision in any manner that is available to them at the time. But EPA, not the Forest Service, is the proper entity to evaluate compliance with state water quality standards. CONCLUSION CONCLUSION __________ We affirm the district court's denial of defendant Loon's motion to dismiss plaintiff Dubois' complaint for failure to meet his burden of establishing his standing to sue. We reverse the district court's grant of summary judgment in favor of defendants and reverse the district court's denial of summary judgment in favor of plaintiffs, with   ____________________ 34. Whether or not the NHDES certifies that state water quality standards have been met, EPA would be "bound to include in the federal permit 'any more stringent limitations . . . established pursuant to any State law or regulations (under authority preserved by section 510).'" Roosevelt _________ Campobello, 684 F.2d at 1056 (quoting 33 U.S.C.  __________ 1311(b)(1)(C)). -75- respect to  (1) the NEPA/EIS issue relating to consideration of alternatives,  (2) the supplemental EIS issue, and  (3) the NPDES permit issue.  We affirm the district court's grant of summary judgment in favor of defendants and affirm the district court's denial of summary judgment in favor of plaintiff Dubois, with respect to the alleged violations of  (1) Executive Order 11,990, and  (2) state water quality standards under the CWA. Affirmed in part; reversed in part; remanded; costs Affirmed in part; reversed in part; remanded; costs ___________________________________________________ on appeal awarded to plaintiffs. on appeal awarded to plaintiffs. _______________________________ -76-