SURF AND ENVIRONMENT CONSER-
VATION COALITION, an unincorpo-
rated association; Angel Rodriguez–
Soto and Axel Robles–Charneco
Plaintiffs

v.

DEPARTMENT OF THE ARMY
UNITED STATES OF AMER-
ICA Defendants

No. CIV. 01–1149CCC.

United States District Court,
D. Puerto Rico.

Feb. 12, 2004.

Miguel Sarriera–Román, Arecibo, PR, for Plaintiffs.

H.S. García, U.S. Attorney, Isabel Mu-ñoz–Acosta, Assistant U.S. Attorney, for Defendant or Respondent.

## ORDER

CEREZO, District Judge.

## I. PROCEDURAL BACKGROUND

This is a citizen's suit brought by two individual plaintiffs and the Surf and Environment Conservation Coalition under Section 505 of the Clean Water Act "CWA," 33 U.S.C. § 1365(a)(1), against the United States and the Department of the Army. The action charges violations of § 404(b) of the CWA which allegedly occurred at a beach known as "La Marginal" in Arecibo, Puerto Rico. The activity complained of, which was covered by the CWA, was the discharge of dredged material into navigable waters of the United States during the dredging of the Arecibo harbor by the Corps of Engineers for the Jacksonville district ("Corps") during the month of June, 2000.

Starting with the only public notice issued which identified the first disposal site for the material removed from the harbor, the amended complaint tracks the Corps various abandoned site choices on to the final depository in open waters in June 2000. Plaintiffs raise violations of procedural requirements including (1) failure to publish the only public notice on the first disposal site; (2) lack of public notices on subsequent sites, the open water offshore from La Marginal beach being the final site; (3) failure to obtain the Puerto Rico Environmental Quality Board water quality certification under Section 401 of the CWA for the site ultimately used and (4) failure to comply with Section 404(b)(1) Guidelines regarding the evaluation of this site. Defendants' answer denied all of the allegations of noncompliance.

The Court bifurcated the liability and remedies issues. With regard to the first phase, on April 8, 2003 the parties filed a Joint Stipulation Regarding Administrative Record and Joint Motion Requesting Schedule for Briefing Liability (docket entry 67). The administrative record was submitted with its Index, as Attachment A.[1] The parties also made the two following stipulations of fact:

I Apart from the Department of the Army's ("Army's") letter to the Environmental Quality Board ("EQB") dated July 27, 1999, and the enclosed EQB document dated February, 20, 1981, which are identified in this case as Certified Index No. 23.1, Army did not send any other application to the EQB for a waiver of water quality certificate for the Arecibo harbor dredging project.

II The Department of the Army did not issue a public notice or seek public comments in conjunction with its letter of July 27, 1999, to the Environmental Quality Board requesting a waiver of water quality certificate for the Arecibo Harbor dredging project.

The case is presently before the Court on cross motions for summary judgment on the liability issue. *See* Plaintiffs' motion, docket entry 73 and defendants' motion, docket entry 74. We begin by setting forth the relevant statutory and regulatory framework against which the parties' respective positions must be tested:

## II. POLICY STATEMENTS IN THE CLEAN WATER ACT

Congress expressed in the CWA the objective of restoring and maintaining the chemical, physical and biological integrity of the Nation's waters. 33 U.S.C.

§ 1251(a). One of its goals is to achieve water quality "which provides for the protection and propagation of fish, shellfish and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(2). National policy envisions "the control of both point and non-point sources of pollution." 33 U.S.C. § 1251(a)(7).

The CWA defines pollutant to mean, among other things, "dredged spoil, solid waste, rock, and sand." 33 U.S.C. § 1362(6). That same section defines "navigable waters" as

the waters of the United States, including the territorial seas. The term 'territorial seas' means the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles.

*Id.,* at (7)and (8).

Section 404(b)(1) Guidelines for Specification of Disposal Sites, 40 CFR Part 230, are intended to implement the policies established in the CWA. 40 CFR 230.1(c) provides that

[f]undamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

This policy statement is significant since defendants do not dispute that "when dredging and disposal finally commenced in early June 2000, disposal initially was

---

1. This opinion will use the index numbers in reference to administrative documents. Plaintiffs referred to the page numbers of the exhibits accompanying their summary judgment motion rather than the index numbers.

carried out not only on the beach but in the nearshore areas extending several hundred feet into the water."[2] The findings[3] of the Corps made subsequent to the June 2000 dumping of dredged material into open waters, the final site object of this litigation, describe the area covered:

> The field investigation revealed the project area consists entirely of hardbottom habitats as shown on Figure 2 (Hardbottom Map). The northern (from 300 to 600 feet offshore) portion of the project site was 12 to 20 feet in depth and consisted of exposed limestone (2 to 4 foot relief) with red algae, brown algae, sponges, gorgonians and scattered hard corals. Visibility in this area at incoming tide was approximately 6 feet. At outgoing tide, sediments from the river reduced visibility to 3 feet or less offshore and less than 1–foot nearshore. Moving toward shore approximately 300 feet offshore, rock relief becomes less pronounced (less than 2–foot relief). This is a very high-energy environment with heavy surf and is dominated by algae and gorgonians. Hard corals were present, but very sparse in this area.
>
> Measurements of the sand fill area indicate approximately 4 acres of hardbottom may have been covered. This area extends an average of 200 feet from the seawall. An additional area approximately 100 wide( approximately 2 acres) running the length of the filled area has a thin layer of sand and fine material cover... during the several days the survey team was in the area, the berm placed at 75 feet from the seawall had entirely been washed out on the western end.

# III. SPECIFICATION OF DISPOSAL SITE

CWA §§ 1344(a) and(b) provide for the use of defined areas as disposal sites. The discharge of dredged or fill material into navigable waters must be at specified disposal sites and each disposal site shall be **specified** through the application of the § 404(b)(1) Guidelines.

The control of discharges of dredged or fill material sought by the Guidelines requires the specification of disposal sites for such discharges into waters of the United States. 40 CFR §§ 230.2(a) and 230.11(f). The term *disposal site* means that portion of the "waters of the United States" "where specific disposal activities are permitted and consist of a bottom surface area and overlying volume of water." 40 CFR § 230.3(i). The Guidelines provide for evaluation and documentation of the activity associated with a discharge, the materials to be extracted and the disposal site which has been proposed. The purpose of this analysis or evaluation is to determine the potential short-term or long-term effects of **each** proposed discharge of dredged or fill material on the physical, chemical and biological components of the aquatic environment. During this evaluation process multiple factors are considered in making a determination of the effects which each discharge will have on the environment. Findings of compliance or non-compliance with Guideline requirements will then be made based on the evaluation and testing which preceded. For example, the effect of the discharge, individually and cumulatively, on the physical substrate at the disposal site includes a comparison of the physical characteristics of the extracted materials to be discharged with the materials constituting the

---

**2.** Page 7, defendants' Reply in Further Support of Cross Motion for Summary Judgment as to Liability (docket entry 77).

**3.** June 26, 2000 Final Report on the Arecibo Nearshore Habitat Assessment, (Index 20).

substrate at the disposal site. Also considered are the potential substrate changes which may occur as a result of movement of the discharged dredged material. Such changes may be predicted on the basis of the volume, location, and rate of discharge, as well as on the individual and combined effects of current patterns, water circulation, wind and wave action, and other physical factors that may affect the movement of the discharged materials. *See* 40 CFR 230.11(a). Among the myriad physical factors considered in determining the nature and degree of impact of the discharge on the components of the aquatic ecosystem are the effects on current patterns of water circulation, fluctuation, salinity, clarity, temperature, obstruction of flow, alterations of bottom contours and loss of environment values. 40 CFR 230.11(b). In making this determination consideration should also be given to grain size of the material discharged, the shape and size of the plume of suspended particulate, the duration of the discharge and the resulting plume. 40 CFR 230.11(c).

## IV. APPLICABILITY OF GUIDELINES AND OTHER REGULATORY PROVISIONS TO THE CORPS

33 CFR Part 335 prescribes the procedures to be followed by the Corps of Engineers to insure compliance with the statutes governing Army Civil Works operations and maintenance projects involving the discharge of dredged or fill material into waters of the United States or ocean waters. Part 335 through 338 are applicable to the Corps when undertaking operation and maintenance activities at Army Civil Works projects. 33 CFR § 335.3 Part 336 establishes the rules to assure appropriate regulation of discharges of dredged material into waters of the United States and ocean waters. Part 337 provides a detailed listing of the contents of the public notice of proposed discharges of dredged materials, state requirements, and statements of findings upon completion of the evaluation process.

Section 336.1(a) provides as follows:

Section 404 of the CWA governs the discharge of dredged or fill material into water of the U.S. Although the Corps does not process and issue permits for its own activities, the Corps authorizes its own discharge of dredged or fill material by applying all applicable substantive legal requirements, including public notice, opportunity for a public hearing and application of the section 404(b)(1) guidelines. *See also* 33 CFR 335.2

## V. SECTION 404 CWA REQUIREMENTS:

### A. Public Notice

Public notification of proposed discharges of dredged or fill materials into navigable waters is required by Section 404 of the CWA. Since discharges of dredged materials into waters of the United States have to be at specified disposal sites pursuant to the CWA, and since a particular discharge site must be specified in compliance with the Guidelines in order for it to be used, it is fundamental that the public notice identify the area, including site alternatives, whether upland, nearshore, open water, ocean disposal, etc. 33 CFR 337.1 sets forth what a notice should normally include. This section cautions that,'[t]he public notice is the primary method of advising all interested parties of the Federal project and of soliciting comments and information necessary to evaluate the probable impact of the discharge of dredged or fill material into waters of the U.S. waters or ocean waters," and, therefore, "[t]he notice should include sufficient information to provide a clear understanding of the nature of the activity and related activities of local interest in order to generate meaningful comment."

Some of the relevant items of information that the public notice should include,

pursuant to section 337.1(a) are the following:

(1) The name and location of the project and proposed disposal site.

(2) A general description of the project and a description of the estimated type, composition and quantity of materials to be discharged, the proposed time schedule of the dredging activity, and the types of equipment and methods of dredging and conveyance proposed to be used.

(3) A sketch showing the location of the project, including depth of water in the area and all proposed discharge sites.

(4) The nature, estimated amount, and frequency of known and anticipated related dredging and discharge to be conducted by others.

(5) A list of Federal, state, and local environmental agencies with whom the activity is being coordinated.

(6) A statement concerning a preliminary determination of the need for and/or availability of an environmental impact statement.

(7) Any other available information which may assist interested parties in evaluating the likely impact of proposed activity, if any.

.    .    .    .    .

(9) If the proposed Federal project would occur in the territorial seas or ocean waters, a description of the project's relationship to the baseline from which the territorial sea is measured.

(10) A statement on the status of the state water quality certification under section 401 of the CWA.

.    .    .    .    .

(13) A statement of endangered species.

(14) A statement on evaluation factors to be considered, adapted from that presented at 33CFR 325.3(b).

4. The text of the regulation incorrectly states

The Corps regulations provide for the distribution and posting of the public notices. 33 CFR 337.2(c) refers to the manner of distribution described in section 325.3(d).[4] Aside from the requirement of sending copies of public notices to concerned federal, local and regional agencies and conservation organizations, the local news media, property owners adjacent to the disposal area, and to any interested party, these regulations also require their posting in post offices or other appropriate public places in the vicinity of the site of the proposed work.

## B. Public Hearings

The section 337.1(b) public notice should also include a statement that any person who has an interest which may be affected by the disposal of the dredged material may request, in writing, a public hearing within the comment period established by the public notice. *See, also* 33 CFR Part 327. Requests for a public hearing under section 327.4(b) shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is no valid interest to be served by a hearing. In case of doubt, a public hearing shall be held.

If a public hearing is conducted to obtain information which will be considered in evaluating a Corps of Engineers project, any data or materials submitted in support of or opposition to the proposed action, as well as the hearing transcript, will be included in the administrative record. 33CFR337.4(b).

## C. Environmental Quality Board Certification

Section 401 of the CWA requires the Corps to seek state water quality certifica-

(c).

132

tion for the discharges of dredged or fill material into waters of the U.S. 33 U.S.C. § 1341; 33 CFR 336.1(a)(1). If the proposed disposal activity may violate state water quality standards, after consideration of the disposal site dilution and dispersion, the Corps district engineer will work with the state to acquire data to satisfy compliance with the state water quality standards, using a manual on "Management Strategy for Disposal of Dredged Material." Waiver of the water quality certification can conclusively be presumed if the state does not take action within six months after the initial request. 33 CFR 336.1(a)(8)(iii).

## D. Environmental Impact Statements

As part of the evaluation process of all Corps dredging projects involving discharge of dredged materials into waters of the U.S., an Environment Impact Statement (EIS) or Environmental Assessment (EA) will be prepared unless the projects are included in a categorical exclusion.

## VI. FACTUAL ANALYSIS

Having considered the administrative record against this statutory and regulatory backdrop the Court concludes:

(1) That the Corps actions and maintenance activities were not in conformity therewith, and that,

(2) the Corps Civil Works project, the dredging of the Arecibo Harbor which resulted in the release of thousands of cubic yards of dredged material into open waters, violated all of the requirements for the discharge of dredged materials in waters of the United States contained in the CWA, the Corps regulations and the 404(b)(1) Guidelines.

We will discuss the non-compliance with the requirements in the same order in which these are outlined above.

The Guidelines and the Corps regulations reviewed above are geared to evaluate the feasibility of each designated disposal site of dredged or fill materials in navigable waters to assure that the marine environment will not suffer significant adverse consequences. The evaluation and testing procedures described in these regulations must necessarily be used in the determination of the environmental suitability of each proposed discharge site. As stated before, there are a myriad of factors considered in evaluating each disposal site through the application of the Guidelines and the Corps regulations, starting with the public notice which must give the name and location of the proposed disposal site on through evaluation factors such as the effect of the movement of the dredged material on the substrate at the proposed disposal site, effects on water circulation, current patterns and turbidity caused by the method, volume, location and rate of the discharge at the site, loss and damage of fish and wildlife resources due to the dredging and disposal activities. The entire regulatory scheme requires full evaluation of the effect which the dredging and disposal may have on a given area. The findings on compliance or non-compliance with the requirements entails a comprehensive analysis of each proposed site. It is a complex process which involves the community, concerned agencies and the Corps personnel involved in the particular dredging project and the ensuing discharge of dredged materials into waters of the United States. Defendants, therefore, cannot propose as compliance a public notice for an upland disposal site when the discharge actually occurred in open waters, nor can it rely on an environmental assessment made of a disposal site abandoned by it when evaluating another distinct location.

We will now discuss defendants' non-compliance with each of the requirements.

## A. January 20, 1999 Public Notice

The January 20, 1999 notice (Index 36) is a joint public notification for the dredging of both the Aguadilla Harbor and the Arecibo Harbor. We are concerned only with the Arecibo Harbor dredging project for which the notice describes the chosen site and an alternative site as follows:

> The dredged material removed from Arecibo **will be placed upland on Ports Authority property**. This material will be temporarily stockpiled on the beach adjacent to the Harbor and hauled via dump truck to the upland site.
>
> .　　.　　.　　.　　.
>
> Alternatives considered for Arecibo Harbor included nearshore placement, upland placement, and no action. The Ports Authority has claimed an interest [in] retaining the dredged material following dredging. Nearshore placement was the next alternative, had Ports not indicated such a desire.

Pages 1 and 3 (our emphasis).

This upland site was soon discarded. Three weeks after the public notice was issued the Corps of Engineers wrote to the Puerto Rico Ports Authority Executive Director informing of their decision to abandon that site. In a February 11, 1999 letter, Index 34, it advised the Ports Authority of the following:

> After preliminary consideration of alternatives for dredging Arecibo Harbor, we have increased our estimate of the shoal material to be removed. We expect to remove some 190,000 cubic yards of material from the Federal channel. This quantity is too large to allow staging and dewatering on the Puerto Rico Ports Authority beach, as we had dis-

cussed previously, and hauling it to an upland disposal site would be very costly. In addition, the beach is very small and the contractor's dredging operation would be delayed unduly while waiting for the material to be trucked off-site. Because of the prohibitive cost of this alternative, we are eliminating it from further consideration.

Confronted with the inadequacy of the upland placement, the nearshore alternative site mentioned in the public notice was chosen. In letters dated February 13, 1999 and March 2, 1999 to the United States Fish and Wildlife Service(FWS) and the Puerto Rico Planning Board, respectively, the Corps describes the preferred option as discharge of the dredged material to the immediately coastal circulation on beaches downstream of the channel and west of the Arecibo River mouth. *See* Index 31 and 35.

As part of the interagency consultation on the new nearshore disposal site, the National Marine Fisheries Service (NMFS) wrote to the chief of the Corps Planning Division on May 17, 1999.[5] NMFS refers in that letter to the Corps' own description of the project as one calling for dredging "a featureless sand bottom" and depositing the dredged material at a disposal area which contains no feeding habitat for any sea turtle species common in Puerto Rico, and no reef or live hardbottom growth. NMFS expressed its concern that any hardbottom communities which may exist could be covered up by the drifting sand. It therefore required that the Corps insure, by conducting "a visual survey, that significant hardbottom does not exist that might be adversely impacted by dredged material disposal im-

---

5. This document, at page 014 of the plaintiffs' attachment to their Motion for Summary Judgment, is not objected to by defendants, although not included as part of the parties'

joint Index. Defendants' consent is noted at footnote 4, page 4 of their reply (docket entry 77).

mediately downstream of the disposal area." pp.2–3, plaintiff's attachment, p.014.

In response to this request, the Corps ordered a survey of the proposed near-shore disposal area to search for live bottom habitats. Dial Cordy and Associates, Inc. conducted the survey and issued a final report entitled Arecibo Hardbottom Habitat Assessment dated November 17, 1999 (Index 18). The survey revealed that most of the project area, contrary to the Corps prior description, consisted of hard-bottom habitats with very few sand areas. Invertebrate species were observed, dominated by sponges, gorgonians, hard corals, conch, and sea urchins. Marine reptiles and fishes were also observed. In a letter dated February 18, 2000 to the NMFS, the Corps recognizes the existence of "extensive hardground habitats for marine fishes, and at least one sea turtle in the proposed nearshore disposal site." The Corps then informs that it has "returned to the plan originally described in the public notice of early 1999 which entailed disposal of dredged material via a pipeline to an existing beach and beach placement of material." It states that, "[t]o avoid any adverse impact to fish or sea turtle habitat, project plans have been revised to allow only beach disposal of dredged material … [d]redged material will be disposed of landward of the mean low water line (MLW) up to and no further inland than the + 5 foot contour, as seen in the drawing 2/3 of the 7 pages of drawings inclosed."

None of these drawings nor the "Plan showing disposal beach" mentioned as an enclosure have been provided to the Court. Defendants, at page 6 of their reply, docket entry 77, admit that in February, 2000 they changed from nearshore disposal to "beach-only" disposal "to avoid any possible impacts on nearshore fish or sea turtle habitat." Although the February 18, 2000

letter does not refer to this new disposal site by the name of La Marginal, it describes the area as a "beach" that is "very steep," which "centers on a city park that is used by surfers and other bathers in calm weather," and which "consists in many places of a thin veneer of sand over a rocky substrate." page 2, Index 9.

This site is **not** one of the options proposed in the public notice of January, 1999, as defendants claim. This beach is neither the upland placement on Ports Authority property originally chosen and described in that notice nor is it the nearshore disposal area mentioned in the notice as the alternative disposal site. It is undisputed that the only two sites for the Arecibo Harbor described in the notice were both abandoned, each for a different reason. After the Corps decided in favor of the "beach-only" disposal it never issued a public notice which included this newly proposed site.

Even more important is the fact that the **actual** disposal activity did not occur on the beach, landward of the MLW line, up to and no further inland than the +5 foot contour, as described by the Chief of the Planning Division of the Corps in letters to other federal agencies. The disposal of the dredged material removed from the Arecibo Harbor was done instead in open waters, a site and method never even mentioned before.

The Corps started dredging on June 9, 2000 (*see* index 19) and for several days thereafter deposited the dredged materials in open waters of the United States. A week later, after making an onsite inspection, the Fish and Wildlife Services expressed its concerns to the Corps. In its June 16, 2000 letter (Index 23c) it advises of the following:

On June 14, 2000, Service biologists Marelisa Rivera and Felix Lopez visited the disposal area for the maintenance

dredging activity at the Arecibo Harbor. Based on their observations, information provided by Corps personnel at the site and from members from the community, open water disposal of the dredged material had occurred at the site for several days.

The information we received indicated that the dredge spoil was initially being deposited about 300 feet from the shoreline. This created a fine grain sandy area over an area that previously contained a coral hard-ground community. The presence of this community was documented by the Corps during previous studies. Sand was deposited in this area for about four days. At the time of the inspection, the pipe had been moved to a location about 100 feet from the seawall and two bulldozers were trying to build a sand berm in the surf zone. The plan at that time was to create a diked cell to receive the dredge spoil discharge. The creation of a dike was being hampered by the surf and fine grain size of the material. Attempts at controlling sedimentation were not in effect at the time of the inspection and dredge material was spilling into the adjacent sea and forming a plume that extended several hundred yards east of the disposal area.

The letter also makes reference to a June 15, 2000 meeting between a Fish and Wildlife Service biologist and Corps staff members where the concerns of the Service and possible remedial actions were discussed.

On June 19, 2000 the Chief of the Corps Planning Division wrote to National Marine Fisheries Service (Index 23a) to acknowledge that the dredging and disposal activity at the Arecibo Harbor "was impacting resources not previously anticipated or coordinated with your office" and that "the dredging operation has been temporarily placed on standby." This is the first time that mention is ever made to anyone that "the project involves the placement of sand ... into the adjacent waters" of La Marginal Beach.

The record reflects the undisputed fact that, when the Corps changed the disposal site for the third time, it went from nearshore disposal to placement **only** on the beach. The February 18, 2000 letter from the Corps to NMFS (Index 9), outlining its plans after abandoning the proposed nearshore area states, at paragraph 3: "[t]o avoid any adverse impact to fish or sea turtle habitats, project plans have been revised **to allow only beach disposal of dredged matter,**" and "dredged material will be disposed of landward of the Mean Low Water (MLW) line." (Emphasis ours.) The National Marine Fisheries Service reply letter (Index 23g) acknowledged the "beach only" disposal site and cautioned that "prior to any beach disposal of dredged materials, ESA section 7 consultation must be concluded with the U.S. Fish and Wildlife Service to avoid potential impacts to nesting sea turtles or sea turtle nests at the beach disposal site" (Index 23f). The Chief of the Corps' Planning Division reiterates, in a February 28, 2000 letter to James P. Oland of the Fish and Wildlife Services, that, after the previously proposed nearshore site, the Corps "revised [its] project plans and specifications to provide for dredging **with land (beach) disposal only** and are now ready to once more solicit bids for the work." (Emphasis ours) He also states "[t]hat is centered at a small municipal park with a pergola overlooking the beach." (Index 23d). In the last paragraph of that letter the Corps makes reference to a "substantial standby cost associated with suspension of the dredging" and to the need of a response "to determine whether to release the dredge to work elsewhere."

■ The Corps argues compliance with the public notice and other requirements to be discussed below, by invoking regulatory provisions relevant to emergency situations, such as 33 CFR 337.7. The short answer to that is that during the evaluation process previous to the open water disposal activity, it complied with the requirements of public notice [6], EQB water quality certification and environmental assessment (EA) for the two alternative sites then contemplated, i.e., upland and near-shore disposal. There is no indication in the administrative record that any intervening circumstances constituting an emergency situation arose in the period between the consideration and rejection of the two originally proposed sites, and the actual disposal activity occurring in early June 2000 that could exempt their compliance with the CWA and regulatory requirements with regard to the final disposal site in open waters or, for that matter, with regard to the beach placement at La Marginal. The argument that the Corps only had to comply with the procedures, if practicable, as to La Marginal as a candidate site for disposal or as to the final disposal site in open waters where the 60,000 cubic yards of dredged material were actually discharged, is totally unfounded.

Defendants also argue that they do not have to restart the notice proceeding each time it decides on a modification to a dredging project. Since there was only one public notice for this dredging and discharge project, the one dated January 20, 1999, defendants need to stretch across the board to a site that was not even proposed in such notice. In doing so, they disregard the purpose of the public notice, which is to elicit information and comments from all interested parties as part of the evaluation process of each proposed discharge site.

As a result of this, when the Corps commenced on June 9, 2000, the discharge of thousands of cubic yards of dredged material into La Marginal beach waters, a public protest ensued. There had been no opportunity before the heavy equipment arrived at the beach to learn about the disposal activity into open waters because the 1999 notice contained absolutely no information of the nature or extent of activity at this particular site.

The record also reflects that the Legislature of the Commonwealth of Puerto Rico learned of the dredging and disposal activity at this site through the media after the operations had taken place. The June 15, 2000 letter (Index 3) from Víctor García San Inocencio, Representative–at–Large, to the Corps confirms this. In response to his inquiry, the Corps responded with a letter, the enclosures to which were purported to answer all of the Representative's questions about the project. The documents included, however, the Public notice of January 20, 1999; the 404(b)(1) evaluation; and the undated preliminary assessment, among others, that relate to the first disposal two sites which were considered, but were later abandoned.

**B. Public Hearing**

Given that there was no public notice for the disposal of dredged materials on La Marginal Beach or in open waters offshore from it, there was no comment period and

---

6. It did not comply with the requirement that the public notice be distributed, however. The Corps acknowledges in its reply (docket entry 77), that the 1999 public notice "was not published in any newspaper, sent to the media, posted in the vicinity of the disposal site or sent to adjoining property owners." p.3. That in itself is a violation of 33 CFR 337.2(c) and 325.3(d) which require dissemination to all of the above.

no opportunity for anyone to request a public hearing to ventilate issues related to these sites.

## C. EQB Water Quality Certification

■ The one and only resolution and notice from the EQB (Index 10), dated August 6, 1999, related to the exemption request for water quality certification for the dredging of the Arecibo Harbor states as follows:

> ...the [Corps] presents arguments to obtain an exemption to the Water Quality Certificate for the emergency dredging of the Port of Arecibo, so that it can remain in operation.
>
> The area has previously been impacted by previous maintenance dredging. The applicant is also proposing **the deposition of the dredged material** *in the Arecibo river banks,* **in order to help combat the erosion problems that exist in the beaches along the Arecibo coast.**

(Emphasis ours.) The resolution continues and grants the requested exemption. Defendants argue that any procedural deficiencies in EQB's issuance of the waiver for the Arecibo Harbor project, would have to be pursued in the Puerto Rico courts. They further contend that the sentence quoted above about the deposit of mater in the river banks "appears to be simply an inadvertent error;" [7] which once again, should be litigated in local court. We cannot agree with defendants' reasoning. It is logical to understand that there would be no need for a water quality certificate for a disposal site on land. The language of the resolution is clear. The "inadvertent error" was not made by the EQB; it was made by the Corps in assuming that it could dump its dredged material wherever it eventually chose simply be-

cause it had an exemption from certification for one particular site. It is also interesting to note that a July 22, 1999 letter from the EQB president to the Corps (Index 37), almost two weeks before the Board issued its resolution, is also clear about the disposal site to be approved. Its first paragraph states:

> The Environmental Quality Board has analyzed the environmental document submitted by the above referenced project. The same consists of emergency dredging for the port of Arecibo, so that the port may continue in operation. The area has previously been impacted by previous maintenance dredging. **Additionally proposed is deposit of the dredged materials to be extracted on the banks of the Arecibo River,** in such manner that it will help in arresting the problem of erosion existing on the beaches along the coast of Arecibo.

(Our translation and emphasis.)

We therefore find that the Corps of Engineers failed to comply with the disposition requiring a water quality certification from the state authority for the disposal activity offshore La Marginal beach.

## D. Environmental Assessment and Section 404(b)(1) Evaluation

■ The Corps regulations on evaluation of their dredging projects involving discharges into waters of the United States provides that "[i]n accordance with the National Environmental Policy Act (NEPA)", and the regulation of the Council on Environmental Quality, an Environmental Impact Statement (EIS) or Environmental Assessment (EA) will be prepared for **all** Corps of Engineers projects involving the discharge of dredged fill material unless such projects are included within a categorical exclu-

---

7. Defendants' Motion for Summary Judgment     p. 17, fn.9.

sion found at 33 CFR Part 230 or addressed within an existing EA or EIS. Defendants do not assert that the actions taken by them are categorically excluded under 33 CFR 230.9. Rather, they argue that there was an existing EA and CWA 404(b)(1) evaluation which covered the activity at the final disposal area in waters off La Marginal. Both of these documents, Index 12 and 13, however, addressed only the nearshore discharge site west of the Arecibo River mouth. The material deposited was expected to be carried by the longshore drift onto eroded beaches.

All of the factual determinations included in these two documents are circumscribed to the nearshore placement which was abandoned by the Corps due to the impact on marine habitats at that particular site. As discussed before, this was the decision taken by the Corps after the final Cordy report of November 1999 concluded that there were extensive hardbottom communities in that specific area. None of the findings and determinations in the EA or 404(b)(1) evaluation have any relationship to the site offshore la Marginal finally used. Ironically, the Finding of No Significant Impact (FONSI) (Index 5) which addresses the beach disposal site at La Marginal is dated June 30, 2000 after the Corps had dumped 60,000 cubic yards of material into the waters offshore La Marginal Beach and after it was considering how to mitigate the adverse impact of this discharge on the environment. Remedial measures were being proposed by the Corps to the National Marine Fisheries Service after the fact (*See* Index 5 last paragraph, Index 8). The Corps' improvisation is made manifest in the letter of June 21, 2000 from the National Marine Fisheries Service where it describes the disposal operations as having "adversely

impacted up to six acres of hardbottom habitat, including the direct filling of four acres and the settling of a thin layer of sand and fine sediment on two acres" and states that **"the District failed to consult prior to initiation of construction and its June 19, 2000 request for EFH consultation did not provide the minimal information necessary to met EFH assessment standards"** (Index 6e [8], our emphasis).

Defendants' entire theory ignores the fundamental precepts established in 40 CFR 230.5 that "in evaluating whether a **particular** discharge site may be specified, the permitting authority should use these Guidelines ..." to, among other things, "identify and evaluate any special or critical characteristics of the candidate disposal site and surrounding areas which might be affected by use of such site, related to their living communities or human uses." 33 CFR 230.5(f) (our emphasis). Defendants made no such evaluation of the beach only site at La Marginal or offshore at La Marginal.

## VII. CONCLUSION

Defendants did not follow the procedures established to determine whether the area finally chosen by them was an area suitable for disposal of dredged material. Since the commencement of this lawsuit they have argued unrelentingly that they had complied with all procedural requirements. The record is devoid of any evidence whatsoever that could lend support to this claim. *Post Hoc* rationalizations are inherently suspect, and in any event are no substitute for the agency's following statutorily mandated procedures. *Dubois v. U.S. Dept. of Agriculture* 102 F.3d 1273, 1289 (1st Cir.1996).

8. *See* minutes dated February 9, 2004.

Accordingly, having considered the administrative record against this statutory and regulatory backdrop the Court concludes: (1) that the Corps' actions and maintenance activities were not in conformity therewith, and that, (2) the Corps Civil Works' project, the dredging of the Arecibo Harbor which resulted in the release of thousands of cubic yards of dredged material into open waters, violated all of the requirements for the discharge of dredged materials in waters of the United States contained in the CWA, the Corps' regulations and the 404(b)(1) Guidelines. The plaintiffs' motion for summary judgment on the issue of liability, (docket entry 73) is GRANTED, and defendants' motion (docket entry 74) is DENIED.

SO ORDERED.